Opinion issued August 29, 2002




 






In The

Court of Appeals

For The

First District of Texas


 





NO. 01-01-01008-CV

____________



SHELL COMPAÑIA ARGENTINA DE PETROLEO, S.A., Appellant


V.


REEF EXPLORATION, INC., Appellee







On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 2000-30800






O P I N I O N

 This is an interlocutory, accelerated appeal from the trial court's denial of a
special appearance filed by appellant, Shell Compañia Argentina De Petroleo, S.A.
(Shell CAPSA). See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (Vernon
Supp. 2002). In 20 issues, Shell CAPSA contends that the trial court erred in denying
its special appearance. In a cross-issue, appellee, Reef Exploration, Inc. (Reef),
contends that the trial court erred in not admitting certain documents offered at the
motion for rehearing related to Shell CAPSA's contacts in Texas. We reverse and
render judgment dismissing the claims against Shell CAPSA without prejudice.

Background


 This case involves the sale of stock in a company that had rights to explore and
produce hydrocarbons in Argentina. On February 28, 1995, Reef entered into a
Participation Agreement with Hinton Production Company (Hinton), W.B. Hinton
Drilling Co., Inc., Hinton Argentina, S.A., and Pet-JA, S.A. (Pet-JA), (1) to obtain a
100% working interest for the exploration and subsequent production of
hydrocarbons on the Rio Colorado Block in Argentina. Reef, a Texas corporation,
assigned its interest to Reef Argentina, S.A. (RASA), an Argentine subsidiary of
Reef. All of the revenue interest was transferred to RASA.

 In October 1996, Compañia General de Combustibles, S.A. (CGC), an
Argentine sociedad anonima, (2) entered into a joint venture with RASA in the Rio
Colorado Block. 

 In November 1997, CGC and RASA discussed bringing in additional parties
to bear the substantial cost of developing the property. In December 1997, CGC
informed Reef and RASA that Shell CAPSA was interested in the Rio Colorado
Block. The parties decided to solicit offers from all interested companies. On March
23, 1998, Shell CAPSA submitted its initial, non-binding bid to CGC's offices in
Buenos Aires. The bid was for $200 million, and Shell CAPSA offered to bear 100%
of the costs and expenses incurred by exploration for a 55% participating interest.

 On March 31, 1998, CGC informed Reef that only three companies, not
including Shell CAPSA, had submitted bids. CGC did not inform Reef about Shell
CAPSA's initial $200 million bid. 

 On May 29, 1998, Shell CAPSA submitted its final offer for a 55%
participating interest in the Rio Colorado Block. Shell CAPSA invited both CGC and
RASA to engage in negotiations. The bid for $186 million was open until midnight
of June 15, 1998, and it was to be governed by the laws of Argentina. On the same
day, CGC represented to Reef that the three potential bidders had all declined to
submit a final bid. Also on the same day, CGC offered to purchase RASA's
participating interest in the Rio Colorado Block for $37.25 million. 

 On June 4, 1998, Reef counter-offered to sell the participating interest for
$48.5 million and promised not to solicit any additional offers provided the
agreements were executed by June 21, 1998. CGC agreed to the counter-offer. Reef
maintains that it agreed to the sale based on CGC's representations that there were no
other submitted offers.

 On June 30, 1998, CGC and Shell CAPSA entered into a confidentiality
agreement for the possible purchase of 100% of the common shares of RASA. This
confidentiality agreement prohibited Shell CAPSA from disclosing any information
related to the RASA transaction. The confidentiality agreement permitted Shell
CAPSA to disclose information with CGC's consent only when the information
became "publicly available," the information was disclosed to an "affiliated
company," or the information was disclosed to "persons who have a clear need to
know in order to evaluate the Company [RASA]." Shell CAPSA was not permitted
to disclose information to RASA without CGC's consent because RASA was not an
"affiliated company" and did not fall under any other category that would permit
disclosure under the confidentiality agreement.

 During July and August 1998, Shell CAPSA performed most of its due
diligence in Buenos Aires, Argentina, employing Argentine legal counsel. Shell
CAPSA also retained counsel in New York and participated in a conference call with
its New York lawyers and a Texas lawyer, representing CGC's parent company,
Sociedad Comercial del Plata, S.A. The parties to the conference call discussed
matters related to the transaction. 

 In August 1998, CGC and Reef substituted CGC's subsidiary, CGC
Internacional Corp. (CGC-IC), a Panamanian corporation, as the purchaser of the
RASA stock. On August 5, 1998, CGC-IC and Shell CAPSA executed a stock
purchase agreement. The agreement required that CGC-IC provide Shell CAPSA
with affidavits from Hinton that it had no claims or rights against RASA. The
affidavits were required to be certified by a notary public having jurisdiction in the
domicile of either company. The statements obtained from Hinton were notarized in
Texas. The agreement also required that CGC-IC provide Shell CAPSA with a final
order issued by a bankruptcy court in Texas permitting Hinton to assign its interest
in the Rio Colorado Block to RASA and proof that there were no pending matters in
the Hinton bankruptcy that could have "any detrimental effect" on RASA. 

 On August 14, 1998, CGC-IC exercised its option to purchase Reef's shares
in RASA. Reef transferred the shares and was paid the agreed price of $48.5 million. 
On August 20, 1998, CGC informed Reef that Shell CAPSA had purchased RASA's
stock from CGC-IC for $186 million. On August 24, 1998, CGC-IC and Shell
CAPSA completed the transaction. 

 Reef sued Shell CAPSA for fraud. Reef contended that CGC made
misrepresentations to Reef, inducing Reef to sell its stock in RASA for $48.5 million,
and then CGC-IC sold its stock to Shell CAPSA for $186 million. Shell CAPSA
contended that it was unaware of any fraud and that it purchased the shares from
CGC-IC with the understanding that Reef had approved such a sale.

 In its original petition, Reef alleged that Shell CAPSA had done and was
continuing to do business in Texas. Shell CAPSA filed a special appearance,
claiming that the trial court had no personal jurisdiction over it. The trial court
denied the special appearance, and this interlocutory, accelerated appeal ensued. 

Standard of Review

 The plaintiff bears the initial burden of pleading sufficient allegations to bring
a non-resident defendant within the provisions of the Texas long-arm statute, but the
defendant must negate all possible grounds for personal jurisdiction. BMC Software
v. Marchand, No. 00-1019, 45 Tex. Sup. Ct. J. 930, 931 (Jun. 27, 2002). (3) Existence
of personal jurisdiction is a question of law, but that determination must sometimes
be preceded by the resolution of underlying factual disputes. Preussag
Aktiengesellschaft v. Coleman, 16 S.W.3d 110, 113 (Tex. App.--Houston [1st Dist.]
2000, pet. dism'd w.o.j.). 

 If a trial court makes findings of fact and conclusions of law, we may review
the fact findings for legal and factual sufficiency. Id. If there is more than a scintilla
of evidence to support the finding, the no-evidence challenge fails. Id. We reverse
the ruling for factual insufficiency of the evidence only if the ruling is so against the
great weight and preponderance of the evidence as to be manifestly erroneous or
unjust. Minucci v. Sogevalor, S.A., 14 S.W.3d 790, 794 (Tex. App.--Houston [1st
Dist.] 2000, no pet.). We review the trial court's legal conclusions based on the
finding of facts to determine their correctness. BMC Software, 45 Tex. Sup. Ct. J. at
932.

 Jurisdiction


 A court may assert personal jurisdiction over a non-resident defendant only if
the requirements of both the United States Constitution and the Texas long-arm
statute are satisfied. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.
407, 414, 104 S. Ct. 1868, 1872 (1984); CSR, Ltd. v. Link, 925 S.W.2d 591, 594 (Tex.
1996). The Texas long-arm statute allows a Texas court to exercise personal
jurisdiction over a non-resident defendant who does business in Texas and reaches
as far as the federal and state constitutional guarantees of due process allow. Tex.
Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997); Garner v. Furmanite
Australia Pty., Ltd., 966 S.W.2d 798, 802 (Tex. App.--Houston [1st Dist.] 1998, pet.
denied). The requirements of the Texas long-arm statute are satisfied if the exercise
of personal jurisdiction comports with federal due process limitations. CSR, 925
S.W.2d at 594.

 A state can exert personal jurisdiction over a non-resident defendant only if the
defendant has some minimum, purposeful contacts with the state, and the exercise of
jurisdiction will not offend traditional notions of fair play and substantial justice. 
Dawson-Austin v. Austin, 968 S.W.2d 319, 326 (Tex. 1998). A non-resident who has
purposely availed himself of the privileges and benefits of conducting business in
Texas has sufficient contacts with the forum to confer personal jurisdiction. CSR,
925 S.W.2d at 594; Garner, 966 S.W.2d at 803. However, a defendant should not be
subject to the jurisdiction of a Texas court based upon random, fortuitous, or
attenuated contacts. CSR, 925 S.W.2d at 595. A non-resident defendant must have
purposely established such minimum contacts with the forum that it could reasonably
anticipate being sued there. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475; 105
S. Ct. 2174, 2183 (1985).

 Evidence of Contacts with Texas


 Both in the trial court and on appeal, the parties have treated this case as one
involving specific jurisdiction. (4) The minimum contacts analysis for specific
jurisdiction focuses on the relationship between the defendant, the forum, and the
litigation. Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc., 835 S.W.2d 645, 650
(Tex. App.--Houston [14th Dist.] 1992, no writ). Specific jurisdiction is established
if the defendant's alleged liability arises from, or is related to, an activity conducted
within the forum. Guardian Royal Exch. Assurance Ltd. v. English China Clays,
P.L.C., 815 S.W.2d 223, 227 (Tex. 1991). The contacts must be purposely directed
at the forum and must have a "substantial connection" that results in the alleged
injuries. (5) Id. at 226 (citing Burger King, 471 U.S. at 462, 105 S. Ct. at 2182); see
also Brown v. Gen. Brick Sales Co., Inc., 39 S.W.3d 291, 294 (Tex. App.--Fort
Worth 2001, no pet.); Memorial Hosp. Sys., 835 S.W.2d at 650. Although not a
separate component, foreseeability is an important consideration in determining
whether a non-resident's ties to a forum create a substantial connection. See MTIS
Ltd. v. Corporacion Interamericana de Entretenemiento S.A. de C.V., 64 S.W.3d 62,
67 (Tex. App.--Houston [14th Dist.] 2001, no pet.). Merely contracting with a Texas
corporation does not satisfy the minimum contacts requirement. TeleVentures, Inc.
v. Int'l Game Tech., 12 S.W.3d 900, 908 (Tex. App.--Austin 2000, pet. denied). 
Prior negotiations, contemplated future consequences, the terms of a contract, and the
parties' course of dealing must be considered in determining whether the defendant
purposely established minimum contacts within the forum. Id. 

 In its first through sixteenth issues, Shell CAPSA contends the trial court erred
in finding the existence of specific jurisdiction. In its first, second, third, fifth,
fourteenth, and fifteenth issues, Shell CAPSA broadly challenges the denial of the
special appearance on the grounds that it offends due process, the contacts were
fortuitous and irrelevant, and the trial court erred in several of its findings of facts. 

 In its sixth through eighth issues, Shell CAPSA contends that certain
agreements are insufficient to establish minimum contacts with Texas. In its ninth
issue, Shell CAPSA contends that the due diligence it performed does not establish
specific jurisdiction. In its tenth through thirteenth issues, Shell CAPSA contends the
trial court erred in concluding a conspiracy established specific jurisdiction. In its
sixteenth issue, Shell CAPSA contends the trial court improperly relied on a "non-interference" letter to find specific jurisdiction. We will address these issues together
with Shell CAPSA's specific challenges to the trial court's findings and conclusions
that Shell CAPSA purposely availed itself through certain agreements with Texas
entities, its due diligence performed in Texas, and an alleged conspiracy involving
a Texas company. 


 Agreements and Letters


 In its sixth, seventh, and eighth issues, Shell CAPSA contends the trial court
erred in relying on certain historical agreements, the Reef/CGC-IC Stock Purchase
Agreement and the CGC-IC/Shell CAPSA Stock Purchase Agreement, in concluding
that specific jurisdiction exists. In its sixteenth issue, Shell CAPSA contends the trial
court erred in finding that Shell CAPSA admitted that it was the driving force behind
CGC's acquisition of the non-interference letter from Reef prior to the close of the
transaction.

 Shell CAPSA was not a party to: the Participation Agreement between the
Hinton/Pet-JA entities, Reef, RASA, and CGC; the Joint Venture Operating
Agreement between RASA and CGC; or the Reef/CGC-IC Stock Purchase
Agreement. Therefore, these documents are not relevant to our consideration of the
issue of specific jurisdiction over Shell CAPSA. 

 The only agreement to which Shell CAPSA was a party, the CGC-IC/Shell
CAPSA Stock Purchase Agreement, was governed by Argentine law. The trial court
found that certain provisions of this agreement were relevant to specific jurisdiction. 
The recitals of the agreement indicated that the stocks in question were those that
CGC-IC had obtained from Reef. In addition, Section 8.1(i) required that Shell
CAPSA receive from Hinton affidavits that it had no claim against RASA or the Rio
Colorado Block. These documents were to be "duly certified by a Notary Public
having jurisdiction in the domiciles of either of the above companies" (emphasis
added). (6) Section 8.1(j) stated that there were no outstanding capital contributions to
be made to RASA, nor was there to be any other claim or right against RASA. (7) 
Section 8.1(k) also required that Shell CAPSA receive from CGC-IC evidence of full
compliance with a consent decree of Hinton bankruptcy, to be issued by a federal
bankruptcy court in Texarkana. Responding to Shell CAPSA's request of assurance
that all pending claims from interested parties had been resolved, CGC's Dallas
attorneys requested a non-interference letter from Reef before the completion of the
transaction. (8)

 Although these contacts are related to some Texas entities, they are too
attenuated to constitute "minimum contacts." Shell CAPSA did not directly contract
with a Texas corporation, and, even if it had, merely doing so would not satisfy the
minimum contacts analysis. See TeleVentures Inc., 12 S.W.3d at 908. The record
does not suggest Shell CAPSA could foresee that it was contracting with Reef, or any
other Texas corporation, which would result in its doing business in Texas. To the
contrary, the record reflects that Shell CAPSA, an Argentine corporation, relied on
CGC, an Argentine corporation acting as Reef's agent, to conduct this stock
transaction.

 We hold that the agreements and letters are insufficient to confer specific
jurisdiction. We sustain Shell CAPSA's sixth, seventh, eighth, and sixteenth issues.


 Due Diligence


 In its ninth issue, Shell CAPSA contends that the trial court erred in relying on
Shell CAPSA's due diligence relating to the CGC-IC/Shell CAPSA Stock Purchase
Agreement to confer jurisdiction. The trial court found the following facts relevant
to due diligence: (1) payments that CGC-IC was required to make to Hinton in
August, 1998; (2) verification of pending matters with the bankruptcy court in
Texarkana, Texas, by Shell CAPSA's New York attorneys, who worked with CGC's
Dallas attorneys; (3) an extensive conference call related to the transaction; (4)
various letters sent between Shell CAPSA's New York attorneys and CGC's Dallas
attorneys prior to the transaction; (5) "some evidence" of dealings with the Tyler
attorneys for Hinton; and (6) a Joint Declaration with Respect to the Satisfaction With
Due Diligence and Certain Conditions to Closing (Joint Declaration) referencing
certain proof of finalized activities involving Hinton. 

 First, the payments to Hinton were sent by CGC, not Shell CAPSA. Moreover, 
payments sent to the forum state are not determinative. See Magnolia Gas Co. v.
Knight Equip. & Mfg. Corp., 994 S.W.2d 684, 691 (Tex. App.--San Antonio 1998,
no pet.). Second, the evidence shows that Shell CAPSA never communicated directly
with Reef. The communications amounted to one conference call between attorneys
representing CGC and Shell CAPSA (Reef's attorneys were not on the phone), three
faxes sent between attorneys for CGC and Shell CAPSA, and a call from a CGC
attorney who informed Shell CAPSA's attorneys of the verification of matters
pending in the bankruptcy court in Texarkana, Texas. It was also CGC's attorneys
who contacted the attorneys in Tyler, Texas. In any event, engaging in negotiations
with a party's attorney is not enough to establish minimum contacts. MTIS Ltd., 64
S.W.3d at 68. Reef cites Memorial Hospital System for the proposition that a single
phone call can establish specific jurisdiction. Id. at 650. In that case, however, the
telephone call was the cause of the injury to the plaintiff in Texas. Id. The court held
that, because the false information given led to a foreseeable economic injury in
Texas, there was a substantial connection between the defendant and Texas. Id. In
this case, Reef contends that, during the conference call in question, the parties
developed the plan to deceive Reef into selling its shares in RASA at a discount to
CGC, which would then sell the shares to Shell CAPSA. The record does not support
such a contention. The summary of the conference call outlines various financial and
due diligence matters to be performed prior to closing the stock purchase agreement. 
The record does not reflect any communication between Shell CAPSA and Reef
demonstrating a substantial connection between Shell CAPSA and Texas.

 Finally, the Joint Declaration was a document signed by representatives from
CGC-IC and Shell CAPSA, reflecting the completion of due diligence prior to closing
the transaction. This document did not involve any agreement between Shell CAPSA
and a Texas corporation, and the Texas corporations mentioned in the Joint
Declaration were merely part of the due diligence that had to be performed. Such
fortuitous contacts made pursuant to the closing of a transaction do not meet the
minimum contacts analysis. See Magnolia Gas, 994 S.W.2d at 691.

 We hold that the due diligence performed prior to the close of the transaction
between CGC-IC and Shell CAPSA is insufficient to confer specific jurisdiction. We
sustain Shell CAPSA's ninth issue.


 Conspiracy


 In its tenth through thirteenth issues, Shell CAPSA contends the trial court
erred in assuming a conspiracy between Shell CAPSA and CGC to impute contacts
CGC had with Texas.

 When a plaintiff alleges a conspiracy as a basis for specific jurisdiction, the
non-resident defendant must know, or have good reason to know, that his conduct
will have effects in the forum state. Gen. Elec. Co. v. Brown & Ross Int'l Distribs.,
Inc., 804 S.W.2d 527, 533 (Tex. App.--Houston [1st Dist.] 1990, writ denied) (citing
to McFee v. Chevron Int'l Oil Co., 753 S.W.2d 469, 473 (Tex. App.--Houston [1st
Dist.] 1988, no writ)). Although the trial court did not state in its conclusions of law
that Shell CAPSA and CGC were conspiring in the transaction in question, it stated
at the special appearance hearing that it had to "assume the allegations with respect
to the conspiracy." The trial court made no specific findings of fact with regard to
conspiracy.

 Reef contends that Shell CAPSA was aware Reef and CGC were partners. 
Reef points to several facts that purportedly demonstrate that Shell CAPSA and CGC
engaged in a conspiracy to purchase the shares of RASA from Reef at a substantial
discount. Reef points to the confidentiality agreement that Shell CAPSA and CGC
signed with regard to the RASA shares, to the conference call in which attorneys for
CGC and Shell CAPSA discussed matters involving the closing of the transaction,
and to the non-interference letter obtained as a result of Shell CAPSA's demands.

 However, the evidence negates the existence of a conspiracy to defraud Reef. 
The record establishes that CGC misled Shell CAPSA as well as Reef. Although both
Reef and Shell CAPSA knew of each other's participation and interest in the
property, CGC led both parties to believe that the other was interested in
communicating only through CGC. The initial bid letters instructed Shell CAPSA to
respond to CGC's office, and neither Reef nor Shell CAPSA directly contacted each
other. Moreover, there is no evidence that Shell CAPSA knew the price at which
CGC was purchasing RASA stock because, in all copies of the Reef/CGC-IC Stock
Purchase Agreements, the purchase price was redacted. Shell CAPSA paid $186
million for stock CGC had acquired a few days earlier for $48.5 million. There is no
evidence in the record to support the trial court's implied fact findings that a
conspiracy to defraud Reef existed. See BMC Software, 45 Tex. Sup. Ct. J. at 933-34
(holding that there was no evidence in the record to support the trial court's implied
fact finding to support specific jurisdiction).

 We sustain Shell CAPSA's tenth through thirteenth issues.

 Shell CAPSA has negated all possible grounds for asserting specific
jurisdiction. It could not have foreseen that its participation in a stock purchase
agreement with another Argentine corporation would have resulted in a substantial
connection with Texas. Having held so, it would offend due process to assert
jurisdiction over Shell CAPSA, and we sustain Shell CAPSA's first, second, third,
fifth, fourteenth, and fifteenth issues .

 Having concluded that Shell CAPSA negated all grounds for personal
jurisdiction, we need not address its seventeenth issue, which contends that exercising
personal jurisdiction would not comport with traditional notions of fair play and
substantial justice.

Reef's Cross-Issue

 In its cross-issue, Reef contends that the trial court abused its discretion by not
allowing Reef to submit two affidavits in response to Shell CAPSA's motion for
rehearing on the special appearance. Reef contends that the trial court has discretion
to consider affidavits filed fewer than seven days before the special appearance
hearing. See Tex. R. Civ. P. 120a(3); Potokvick v. Reg'l Ventures, Inc., 904 S.W.2d
846, 850 (Tex. App.--Eastland 1995, no writ). The special appearance hearing was
on October 9, 2001, and Reef filed its affidavits after the special appearance hearing
and just before the October 26, 2001 rehearing. (9) 

 The two affidavits in question were from Hinton officials. Reef also attempted
to submit 39 pages of records and two computer compact disks from Pet-JA. All of
these documents referred to events that occurred after suit was initiated by Reef.

 Contacts occurring after suit has been filed are irrelevant. A trial court should
examine a defendant's contacts with the forum state over a period that is reasonable
under the circumstances, up to and including the date the suit was filed. Preussag,
16 S.W.3d at 126. The trial court did not abuse its discretion in excluding evidence
that was submitted after seven days prior to the special appearance rehearing and that
was related to events occurring after suit was filed.

 We overrule Reef's cross-issue.


Conclusion

 We hold there is no evidence to support the trial court's conclusion that Shell
CAPSA's contacts with Texas were sufficient to confer personal jurisdiction. 
Accordingly, we reverse the order of the trial court and render judgment dismissing
the case against Shell CAPSA without prejudice for lack of personal jurisdiction.


 

 Tim Taft

 Justice


Panel consists of Justices Mirabal, Taft, and Alcala.

Publish. Tex. R. App. P. 47.1.
1. We will refer to these four companies collectively as the "Hinton/Pet-JA
entities."
2. A Sociedad Anomina (S.A.) is a type of business entity with limited liability
for owners.
3. We overrule Shell CAPSA's nineteenth and twentieth issues because we
disagree with the contention that the party seeking personal jurisdiction bears
the ultimate burden of proof.
4. Consequently, we will only address specific jurisdiction. See, e.g., Int'l
Elevator Co. v. Garcia, No. 01-01-00689-CV, slip op. at 6 (Tex.
App.--Houston [1st Dist.] May 9, 2002, no pet.) (citing to Pessina v. Rosson,
No. 03-01-00204-CV, slip op. at 5 (Tex. App.--Austin Nov. 15, 2001, pet.
filed Feb. 4, 2002) (addressing only specific jurisdiction when parties
stipulated general jurisdiction not at issue)). Accordingly, we will not address
Shell CAPSA's eighteenth issue which, in cursory fashion, asserts the trial
court correctly found that there was no general personal jurisdiction over Shell
CAPSA.
5. In its fourth issue, Shell CAPSA contends that specific jurisdiction should be
determined under the "substantive relevance test," which requires that the non-resident defendant's purposeful contacts be at least a proximate cause of the
plaintiff's injury. We decline to follow this test inasmuch as this test has not
been adopted by any court in our jurisdiction. We overrule Shell CAPSA's
fourth issue because that issue requests application of the "substantive
relevance" test.
6. The trial court found, in its sixth finding of fact, that Shell CAPSA required
Hinton's statement to be notarized by a Texas notary. The agreement actually
stated that the statement could be notarized in a jurisdiction of either
companies' domicile.
7. The trial court found, in its thirteenth finding of fact, that the Shell CAPSA-CGC-IC transaction required written confirmation from Reef for the Reef-CGC
transaction. The trial court referred to a letter dated August 4, 1998. The
agreements did not require written confirmation from Reef for the Reef/CGC
transaction; rather, CGC actually requested the August 4, 1998 letter.
8. The trial court's twentieth finding of fact states that Shell CAPSA admitted it
was the "driving force" behind CGC's acquisition of the non-interference letter
signed by Reef's president. Our review of the record indicates that Shell
CAPSA made no such admission or request and that it was CGC that sought
and acquired the letter.
9. There is no mention of exactly when the affidavits were filed, but it is clear
they were filed after the October 9, 2001 special appearance hearing.