Opinion issued May 5, 2005
     













In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00998-CV




CRAIG GLATTLY, Appellant

V.

CMS VIRON CORPORATION F/K/A VIRON ENERGY SERVICES,
Appellee




On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2002-54422




O P I N I O N

          Appellant, Craig Glattly, appeals from the denial of his special appearance. See
Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (Vernon Supp. 2004-2005). We
affirm.
Background
          Glattly, who is not a Texas resident, wore several corporate hats. First, he was
the president and CEO of Academic Capital, L.L.C. Second, Glattly was a principal
shareholder, the president, and the CEO of Academic Capital Group, Inc. (“ACG”),
which was incorporated in 1999 to succeed to the business of Academic Capital,
L.L.C. Third, Glattly was a principal shareholder, the president, and the CEO of
Academic Capital Services, Inc. (“ACS”).


 In this opinion, we refer to ACG and ACS
together as “the Academic entities.” None of the Academic entities was a Texas
corporation.
          ACG’s business was to underwrite and to finance certain leases, which ACG
accomplished with capital provided under lines of credit with third-party lenders. 
ACS completed the lease transactions and administered the agreements’ lease
payments. 
          Appellee, CMS Viron Corporation (“Viron”), was a Missouri corporation that
was awarded a contract by Texas Southern University (“TSU”) to construct an
energy-savings project on TSU’s Houston campus (“the TSU project”). To
consummate this agreement, Viron and TSU entered into a “Master State and
Municipal Lease/Purchase Agreement” (“the Master Lease”) in 1998. Viron was the
lessor under the Master Lease, and TSU was the lessee. Under the Master Lease,
Viron was to lease the TSU project’s equipment to TSU, and TSU was to make rental
payments to Viron. To finance the TSU project, Viron assigned its rights under the
Master Lease to ACG’s predecessor (“the Lease Assignment”). To service the
amount financed, Viron, ACS, and TSU entered into an escrow agreement (“the
Escrow Agreement”), under which ACS was the escrow agent for the TSU project. 
In transactions such as that between Viron and TSU, ACG and its predecessor
functioned as interim lenders, assigning their rights to the stream of rental payments
under such leases to permanent lenders interested in receiving the income stream. 
Accordingly, ACG’s predecessor assigned its rights under the Master Lease to State
Street Bank and Trust of Boston (“State Street Bank”).
          The Master Lease between Viron and TSU provided that it was to be construed
in accordance with the laws of Texas. The Lease Assignment between Viron and
ACG’s predecessor provided, in part, that
If [Viron] has performance responsibilities under the Master Lease, and
[TSU] abates payment of rent due to [Viron]’s lack of performance (as
determined by [TSU]), then, upon notice to [Viron] from [ACG’s
predecessor], [Viron] will remit such abated amount within 10 days of
[ACG predecessor’s] notice.

The Escrow Agreement signed by Viron, TSU, and ACS provided, in part, as follows:
1.This Escrow Agreement relates to and is hereby made part of the
[Master Lease] dated August 22, 1998 between [Viron] and
[TSU], . . . .
 
. . .
 
3.[Viron, TSU, and ACS] agree that [ACS] will act as sole escrow
agent under the [Master] Lease and this Escrow Agreement . . . . 
[ACS] shall not be deemed to be a party to the [Master] Lease,
and this Escrow Agreement shall be deemed to constitute the
entire agreement between [Viron, TSU, and ACS].
 
. . .
 
7.Moneys in the [escrow fund] shall be used for the cost of
acquisition of the Equipment and related delivery, engineering
and installation costs. Payment shall be made from the [escrow
fund] for the cost of acquisition of part or all Equipment upon
presentation to [ACS] of one or more properly executed Payment
Request Forms executed by [TSU] . . . .
 
[TSU] agrees that, should the final acceptance of the Equipment
not occur prior to December 30, 1999, the unspent funds in the
[Escrow account] shall become the property of [TSU], and that
the [Master] Lease and Lease Payments will commence as if
Acceptance had occurred on December 30, 1999, pursuant to
sections 2 and 4 of the [Master] Lease.
 
. . .
 
12.This Escrow Agreement shall be governed by and construed in
accordance with the laws of the State of Illinois. . . . .
(Emphasis added.)
          ACS made three of four payments from the escrow account to Viron for the
TSU project. However, in December 1999, before the fourth payment was requested
or made, ACS learned, from communications between TSU and Glattly, that TSU was
alleging problems with Viron’s performance on the TSU project. TSU soon stopped
making rental payments under the Master Lease. After TSU stopped making rental
payments, Glattly directed that the funds in the escrow account be paid to State Street
Bank, rather than to Viron.


 Suffice it to say that the parties disputed below and
dispute on appeal both Glattly’s motivation for ordering payment to State Street Bank
and the legal significance of that decision.


 In a nutshell, the underlying litigation
arose out of both the failed TSU project and the payment of the escrow funds to State
Street Bank, rather than to Viron.
          In October 2002, State Street Bank sued Viron for breach of contract,
negligence, and breach of warranty relating to Viron’s alleged faulty performance
under the Master Lease and related matters. In December 2002, Viron
counterclaimed against State Street Bank for breach of contract, conversion, and
breach of fiduciary duty; asserted third-party claims against TSU for breach of
contract and quantum meruit; and asserted third-party claims against the Academic
entities for breach of contract, conversion, and breach of fiduciary duty relating to the
payment of escrow funds to State Street Bank, rather than to Viron. Viron also
sought indemnification from TSU if State Street Bank prevailed in its claims against
Viron. In December 2003, the Academic entities asserted third-party claims against
State Street Bank, seeking indemnification if Viron prevailed on its claims against the
Academic entities.
          By February 2004, Viron had amended its petition to assert claims against
Glattly, Dennis Stephans,


 and Eric Harkness


 in their individual capacities
(collectively, “the individual defendants”) for breach of fiduciary duties, conversion,
negligence (including gross negligence), fraud, breach of contract, tortious
interference with contractual relationships, and misapplication of fiduciary property,
all apparently relating to the payment of the escrow funds to State Street Bank.


 
Among other things, Viron alleged that the individual defendants were personally
liable to it because they (1) had “knowingly authorized, directed, participated in and
ratified” the Academic entities’ breach of fiduciary duties, breach of contract, and
conversion; (2) had been “negligent in the performance of their duties as officers and
directors of [the Academic entities], and in the supervision and management of the
Acquisition Fund”; and (3) had tortiously interfered with the Academic entities’ and
Viron’s contractual relationship “by causing the escrowed funds to be transferred to
State Street Bank.”


 Separately and alternatively, Viron also alleged that the
individual defendants were liable on all causes of action asserted against the
Academic entities by virtue of those entities’ being the individual defendants’ alter
egos. Each individual defendant specially appeared to contest personal jurisdiction
over him.
          The trial court granted the special appearances of Harkness and Stephans, but
denied the special appearance of Glattly. Glattly appeals.



Standard of Review
          Although a legal conclusion concerning the existence of personal jurisdiction
is a question of law subject to de novo review, that conclusion must sometimes be
preceded by the resolution of underlying factual disputes. BMC Software Belgium,
N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002); Am. Type Culture Collection v.
Coleman, 83 S.W.3d 801, 805-06 (Tex. 2002). When, as here, the trial court does
not issue fact findings, we presume that the trial court resolved all factual disputes in
favor of its ruling. Am. Type Culture Collection, 83 S.W.3d at 805-06. When the
appellate record contains the applicable trial record, these implied factual findings are
not conclusive, and an appellant may challenge them for evidentiary sufficiency. 
BMC Software Belgium, 83 S.W.3d at 794; Preussag Aktiengesellschaft v. Coleman,
16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism’d w.o.j.);
Wright v. Sage Eng’g, Inc., 137 S.W.3d 238, 248 (Tex. App.—Houston [1st Dist.]
2004, pet. denied). However, we apply a de novo review to the extent that the
underlying facts are undisputed. Preussag Aktiengesellschaft, 16 S.W.3d at 113.
Personal Jurisdiction
          In two issues, Glattly argues that the trial court erred in denying his special
appearance because the court had no specific personal jurisdiction over him, it had
no general personal jurisdiction over him, and it could not assert personal jurisdiction
over him based on the corporate defendants’ being his alter egos.
A.      The Law
          The plaintiff bears the initial burden of pleading allegations sufficient to bring
a non-resident defendant within the terms of the Texas long-arm statute.


 Am. Type
Culture Collection, 83 S.W.3d at 807. When a non-resident defendant files a special
appearance, however, the defendant assumes the burden of negating all bases of
personal jurisdiction that the plaintiff has alleged. Id.
          The long-arm statute provides that, “[i]n addition to other acts that may
constitute doing business, a nonresident does business in this state if the nonresident:
. . . (2) commits a tort in whole or in part in this state . . . .” Tex. Civ. Prac. & Rem.
Code Ann. § 17.042(2) (Vernon 1997). “On reaching a decision to exercise or [to]
decline jurisdiction based on the defendant’s alleged commission of a tort, the trial
court should rely only on the necessary jurisdictional facts and should not reach the
merits of the case.” Wright, 137 S.W.3d at 251 n.10; accord Stauffacher v. Lone Star
Mud, Inc., 54 S.W.3d 810, 819 (Tex. App.—Texarkana 2001, no pet.); Royal Mort.
Corp. v. Montague, 41 S.W.3d 721, 732 (Tex. App.—Fort Worth 2001, no pet.);
Portland Savs. & Loan Ass’n v. Bernstein, 716 S.W.2d 532, 535 (Tex. App.—Corpus
Christi 1985, writ ref’d n.r.e.) (tort allegations), overruled on other grounds, 
Dawson-Austin v. Austin, 968 S.W.2d 319, 323 (Tex. 1998). “[U]ltimate liability in
tort is not a jurisdictional fact, and the merits of the cause are not at issue.” Wright,
137 S.W.3d at 251 n.10. “Rather, the purpose of a special appearance is to determine
whether the actions alleged by a plaintiff suggest that a defendant should expect to
be subject to jurisdiction in Texas.” Id. “Accordingly, . . . the necessary proof is only
that the purposeful act was committed in this State.” Id.
          A court may assert personal jurisdiction over a non-resident defendant only if
“the Texas long-arm statute authorizes jurisdiction and the exercise of jurisdiction is
consistent with federal and state due process standards.” Am. Type Culture
Collection, 83 S.W.3d at 806. Because the Texas long-arm statute reaches as far as
the federal constitutional requirements of due process will allow, the statute is
satisfied if the exercise of personal jurisdiction comports with federal due process. 
Id.
          Federal due process requirements are two-fold. First, the non-resident
defendant must have purposefully established such minimum contacts with the forum
state that the defendant could reasonably anticipate being sued there. Burger King
Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 2183-84 (1985). If the
non-resident defendant has purposefully availed itself of the privileges and benefits
of conducting business in a state, the defendant has sufficient contacts to confer
personal jurisdiction. Id. Random, fortuitous, or attenuated contacts do not suffice. 
Id. It is the quality and nature of the contacts, rather than their number, that is
important. Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.D.,
815 S.W.2d 223, 230 n.11 (Tex. 1991). “The purpose of the minimum-contacts
analysis is to protect the defendant from being haled into court when its relationship
with Texas is too attenuated to support jurisdiction. Accordingly, we focus upon the
defendant’s activities and expectations in deciding whether it is proper to call it
before a Texas court.” Am. Type Culture Collection, 83 S.W.3d at 806 (citations
omitted). “Although not determinative, foreseeability is an important consideration
in deciding whether the nonresident defendant has purposefully established minimum
contacts with the forum state.” Wright, 137 S.W.3d at 247.
          Minimum-contacts analysis is further divided into general and specific personal
jurisdiction. CSR, Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996). Specific personal
jurisdiction exists if the defendant’s alleged liability arises from or is related to an
activity conducted within the forum. Id. The defendant’s contacts must thus have
had a substantial connection to the forum that resulted in the alleged injuries. Shell
Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc., 84 S.W.3d 830, 837
(Tex. App.—Houston [1st Dist.] 2002, pet. denied). However, the “substantial
connection” and “related to” requirements of specific personal jurisdiction do not
mean that the non-resident defendant’s purposeful contacts had to have been a
proximate cause of the plaintiff’s alleged injury. See id. at 837 n.5 (“[Defendant]
contends that specific jurisdiction should be determined under the ‘substantial
relevance test,’ which requires that the non-resident defendant’s purposeful contacts
be at least a proximate cause of the plaintiff’s injury. We decline to follow this test
inasmuch as this test has not been adopted by any court in our jurisdiction.”). In
considering specific personal jurisdiction, we focus our minimum-contacts analysis
on the defendant’s, the forum’s, and the litigation’s relationship with each other. 
Wright, 137 S.W.3d at 248. “It is not necessary that a nonresident defendant’s
conduct actually occur in Texas, as long as the defendant’s acts were purposefully
directed toward the state.” Id. 
          General personal jurisdiction allows a forum to exercise jurisdiction over a
defendant even if the cause of action did not arise from or relate to the defendant’s
contacts with the forum. Am. Type Culture Collection, 83 S.W.3d at 806-07. To
result in general personal jurisdiction over a defendant, the defendant’s contacts with
the forum must be continuous and systematic, which is a more demanding
minimum-contacts analysis than that for specific jurisdiction. Id. at 807.
          Second, if the nonresident defendant has purposefully established minimum
contacts with the forum, the exercise of personal jurisdiction must also comport with
fair play and substantial justice. Burger King Corp., 471 U.S. at 475-76, 105 S. Ct.
at 2183-84; Guardian Royal, 815 S.W.2d at 228.
B.      Specific Personal Jurisdiction
          Under part of his first issue, Glattly argues that Texas courts have no specific
personal jurisdiction over him.
          We begin by noting that Glattly made his special appearance “to the entire
proceeding,” rather than asserting that specific claims were severable and making his
special appearance only as to them. See Tex. R. Civ. P. 120a(1) (“A special
appearance may be made as to an entire proceeding or as to any severable claim
involved therein.”); Dawson-Austin, 968 S.W.2d at 324. Neither did his personal-jurisdiction briefing below assert separate jurisdictional arguments for separate causes
of action or argue that any cause of action against him was severable. Accordingly,
if personal jurisdiction exists over Glattly with respect to any claim that Viron
alleged, we will hold that the trial court properly denied his special appearance. See
Dechon v. Dechon, 909 S.W.2d 950, 955 & n.5 (Tex. App.—El Paso 1995, no writ)
(in family-law case in which plaintiff had pleaded both modification and enforcement
causes of action, and in which personal jurisdiction existed with respect to
enforcement cause of action but did not exist initially with respect to modification
cause of action, holding that, “in light of [defendant’s] generic special appearance
which contested the trial court’s jurisdiction as to ‘the entire proceeding,’ rather than
contesting jurisdiction as to the modification [cause of action] only, we find that the
trial court was correct in overruling [defendant’s] special appearance.”).
          Among other claims, Viron alleged that Glattly had personally committed
various intentional torts against it, such as breach of fiduciary duty, conversion, fraud,
tortious interference with contractual relationships, and misapplication of fiduciary
property. “It is well-settled that a corporate agent can be held individually liable for
fraudulent statements or knowing misrepresentations even when they are made in the
capacity of a corporate representative.” Wright, 137 S.W.3d at 250; accord Barclay
v. Johnson, 686 S.W.2d 334, 336-37 (Tex. App.—Houston [1st Dist.] 1985, no writ)
(“[A] corporate agent knowingly participating in a tortious or fraudulent act may be
held individually liable, even though he performed the act as an agent for the
corporation.”). “It is not necessary that the ‘corporate veil’ be pierced in order to
impose liability, as long as it is shown that the corporate officer knowingly
participated in the wrongdoing.”


 Barclay, 686 S.W.2d at 337.
 
          In response to Glattly’s special appearance, Viron produced evidence showing
that the escrow account, funds, and contractual arrangement and any duties flowing
from them were clearly tied to the TSU project, which took place in Texas. Even
though Glattly did not sign any agreement arising out of the TSU project personally,
the torts that he was alleged to have committed—all of which were based on his
decision to disperse the escrow funds to State Street Bank—necessarily affected the
TSU project because they affected the funds earmarked for payment to the project’s
parties. The disputed escrow funds amounted to over $2 million and constituted the
final payment under the Master Lease, the contract executed to carry out the TSU
project. Additionally, Viron produced as evidence Glattly’s deposition testimony, in
which he admitted to having called or talked to Gina Bolt, TSU’s general counsel,
“multiple times” about the problems that had arisen in December 1999 on the TSU
project and indicated that he may have spoken with “anyone at [TSU] who could shed
light on” the situation. The evidence also showed that Glattly received four faxes
from Bolt about matters related to the TSU project dispute. We recognize that Viron
did not allege any tort arising directly out of Glattly’s communications with TSU, but
we regard these communications as showing that Glattly could have foreseen that the
commission of the torts that Viron did allege would affect a project in Texas to which
Viron was a party. 
 
          Given this context, we hold that Glattly’s alleged tort liability sufficiently
“related to” conduct purposefully directed toward Texas, and likewise that Glattly’s
alleged conduct had a sufficiently substantial connection to Texas, for the exercise
of personal jurisdiction over Glattly to comport with due process. Put another way,
it would have been foreseeable to a person committing the tortious acts alleged here
that the injurious effect of those acts would extend into Texas. See Wright, 137
S.W.3d at 248 (“It is not necessary that a nonresident defendant’s conduct actually
occur in Texas, as long as the defendant’s acts were purposefully directed toward the
state.”).
          Glattly does not challenge the sufficiency of the evidence relating to the court’s
implied factual findings based on Viron’s evidence. See Preussag Aktiengesellschaft,
16 S.W.3d at 113 (indicating that appellant may challenge sufficiency of evidence
supporting implied factual findings related to special appearance). Instead, Glattly
challenges the trial court’s implicit legal conclusion that these unchallenged findings
supported the exercise of specific personal jurisdiction over him. Specifically, Glattly
notes that (1) he was not a party to the Escrow Agreement; (2) his alleged actions
took place in Illinois and were undertaken pursuant to an agreement (the Escrow
Agreement) to which Illinois law applied; (3) ACS sent the escrow funds to State
Street Bank in Massachusetts; and (4) Glattly had a choice of sending the escrow
funds either to Massachusetts (State Street Bank) or to Missouri (Viron). Glattly also
argues that (1) he was “duty-bound as a representative of the corporate escrow agent
to determine to whom the balance of funds should go”; (2) his contacts with TSU
were thus “innocent”; (3) had Viron disputed Glattly’s decision to send State Street
Bank the escrow funds, ACS could have considered interpleading the funds, rather
than paying them to the bank; (4) Glattly’s actions “were neither fraudulent nor an
intentional tort” because he “negated that [he had committed] an intentional tort in
the trial court” by “negat[ing] that he sought or received any personal benefit from
his administration of the escrow”—and thus could not have anticipated being haled
into Texas courts in his individual capacity.
          We reject Glattly’s first category of arguments because it focuses on only part
of the overall situation. All of the contracts were interrelated: the Escrow Agreement
existed to service and to fund the Master Lease; the Master Lease existed to allow the
TSU project to move forward; the TSU project took place in Texas. Glattly’s alleged
tortious disposal of the very escrow funds that funded the TSU project thus
substantially related to activities in Texas and could potentially have a significant
effect in that forum. We reject Glattly’s second category of arguments because it
relates, in essence, to the merits of whether he actually committed the intentional torts
that Viron alleged. Ultimate tort liability is not a jurisdictional fact; the merits of
claims are not at issue during a special appearance; and the proof necessary to show
personal jurisdiction is only that the purposeful act was committed in Texas. Wright,
137 S.W.3d at 251 n.10. Accordingly, we reject Glattly’s arguments that the ultimate
merits of Viron’s claims against him show that he could not have anticipated being
haled into court in Texas.
          We hold that Glattly did not carry his burden of negating every basis for
specific personal jurisdiction. Given this holding and the fact that Viron alleged that
Glattly had committed intentional torts and fraudulent acts, we further hold that the
trial court had specific personal jurisdiction over Glattly. Because we have held that
specific personal jurisdiction existed with respect to some of Viron’s claims, and
because Glattly filed his special appearance to the entire proceeding, we also hold that
the trial court did not err in denying his special appearance, and we need not consider
whether specific personal jurisdiction existed with respect to the remainder of Viron’s
claims against Glattly. See Dechon, 909 S.W.2d at 955, 955 n.5. Finally, because we
hold that Texas courts have specific personal jurisdiction over Glattly, we need not
reach Glattly’s alternative challenges to general personal jurisdiction or to jurisdiction
based on alter ego status. See Wright, 137 S.W.3d at 251 n.11.
C.      Fair Play and Substantial Justice
          Because we have determined that Glattly purposefully established minimum
contacts with Texas, we must also determine whether the exercise of personal
jurisdiction over him comports with fair play and substantial justice. See Burger King
Corp., 471 U.S. at 475-76, 105 S. Ct. at 2183-84; Guardian Royal, 815 S.W.2d at
228. 
          Glattly had the burden to present a “compelling case” that exercising personal
jurisdiction over him would not comport with fair play and substantial justice. See
Guardian Royal, 815 S.W.2d at 231. The fairness inquiry is judged by a “stringent
standard” and is met only in “rare cases.” Id. In considering the fairness of
exercising personal jurisdiction over a non-resident defendant, we consider, when
appropriate, such matters as the burden on the defendant, the interests of the forum
state in adjudicating the dispute, the plaintiff’s interest in obtaining convenient and
effective relief, the interstate judicial system’s interest in obtaining the most efficient
resolution of controversies, and the shared interest of the several states in furthering
fundamental, substantive social policies. Id. 
          Glattly asserts that exercising personal jurisdiction over him does not meet this
test. Specifically, Glattly argues that (1) he would be burdened by having to defend
himself in Texas because he did not engage in economic activity in Texas “either at
the time of the alleged liability or at the time the lawsuit was filed, and he does not
now”; (2) Texas has no compelling interest in providing a forum for the resolution
of the dispute between Viron and Glattly because both are non-residents and because
their contacts occurred exclusively out of state; and (3) allowing him to be sued in
Texas just because the other parties to the lawsuit first sued or were sued here “would
permit jurisdiction over a defendant to be determined by plaintiff or by a third-party,
contrary to due process requirements.”



          However, Glattly did not make these specific arguments in the trial court with
respect to the fair-play-and-substantial-justice inquiry. Rather, he twice stated—in
cursory and conclusory fashion—simply that the assertion of personal jurisdiction
over him would offend traditional notions of fair play and substantial justice. The
only elaboration that he provided below was that “Texas has no special interest in
asserting personal jurisdiction over [Glattly], who only ever had random and isolated
contacts with Texas if at all.” Accordingly, Glattly has waived his appellate fair-play-and-substantial-justice challenge. See Tex. R. App. P. 33.1(a)(1). The waiver of this
challenge is another basis for affirming the trial court’s order. Additionally, we note
that the trial would not have erred if it concluded, based on the fact that Glattly’s
alleged tortious acts affected the TSU project in Texas and that the underlying
litigation was based in large part on the same factual nexus, both that (1) Texas has
an interest in adjudicating a dispute that, at its core, relates to a contract for capital
improvements to be performed in the state and (2) the fairness calculation weighs in
favor of adjudicating all related disputes in one forum.
Conclusion
          We overrule appellant’s first issue. We do not reach his second issue
(concerning personal jurisdiction based on alter ego status). We affirm the order of
the trial court.
 


                                                             Tim Taft
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Hanks.