Andreas ASSHAUER, et al., Appellants,

v.

FARALLON CAPITAL PARTNERS, L.P., The Hapsmith Company, Hapsmith Development Corporation, Hapsmith–Auburn IV, L.P., Hapsmith Interests IV, L.P., Hapsmith Partners IV, L.P., Hapsmith Properties III, L.P., Hapsmith Properties IV, L.P., and Robert B. Evans, Appellees.

No. 05–05–01219–CV.

Court of Appeals of Texas, Dallas.

Feb. 12, 2008.

John E. Chapoton, Jr., H. Ronald Welsh, Welsh & Chapoton, L.L.P., Houston, TX, for Appellants.

Paul Brian Lackey, Michael P. Aigen, Scott Michael Garelick, Lackey Hershman, L.L.P., Dallas, Robert A. Axelrad, Zimmerman, Axelrad, Meyer, Stern, & Wise, PC, Houston, TX, for Appellees.

Before Justices MORRIS, MOSELEY, and O'NEILL.

## OPINION

Opinion by Justice MOSELEY.

This is an interlocutory appeal of an order granting the special appearances of certain defendants in a complex case. Appellants are 239 individuals[1] who allege that a number of defendant corporations, partnerships, and individuals defrauded

---

1. In addition to Andreas Asshauer, appellants include Gisela Eichstaedt, Dr. Franz Hammerschmidt, Rudolf Miemietz, Klaus Albers, Helmut Anger, Ulrich Asshauer, Dr. Gudron Ast, Martin Baden, Heinz Otto Baecker, Geert Ballauff, Dr. Ralph Bauer, Hans–Peter Baumhauer, Dr. Jobst Baumhofner, Natascha Annelies Bechtler, Prof. D. Jürgen Becker, Doris Beling, Thomas Beling, John Bennett, Margarete Biedermann, Peter Biedermann, Andreas Billand, Hans Heinrich Blanke, Astrid Bleimund, Erich Bleimund, Harrald Bonas, Dr. Günter Borkhardt, Susanne Böttcher, Umberto Bruni, Dr. Erika Büchler, Thomas Bückle, Dr. Peter Bürkle, Dr. Edgar Collett, Prof. Dr. Conze, Ludwig and Marianne Dallmeier, Gerlinde Dallmeier–Loeffler, Theresia Debes, Dr. Joachim Dedy, Hugo Deisler, Dr. Gunther Dekkert, Dr. Dieter Doll, Klaus Doll, Gunhild Doranth, Prof. Dr. Wolfgang Dutz, Richard–Jürgen Ebling, Oskar Eggenweiler, Birgit Ehrig, Karin Elßner, Peter Emschermann, Horst–Dieter Engler, Ursula Engler, Andrea Engler, Ralf Engler, Dr. Wilma Englert, Birgit Fahrbach, Dr. Kurt Fahrbach, Werner Fasching, Alfred Fasshauer Jr., Marion Möller, Johanna Gniewosz, Hanno Fintzen, Dr. Stephan and Eva Maria Fischer, Bärbel Freymann, Dr. Matthias Immanuel Gams, Christine Garber, Klaus Garber, Dr. Heinz–Dieter Gatermann, Jürgen Gehrke, Gert Goetze, Dr. Wolfgang Goos, Kathrin Gottschalk, Georg Greiss Sr., Dr. Hans Haas, Dr. Viola Haas–Dammert, Dr. Tobias Haas, Lilly Haberstroh, Alexander Haindorff, Renate Hallstein, Prof. Ernst Hammerschmidt, Dr. Michael Hanewinkel, Renate Hänssler, Dr. Joachim Hecht, Eva–Maria and Helmut Heinen, Annegret Hellweg, Andreas and Gisela Hirte, Dr. Herbert Hirtz, Ursula Hoberg, Werner Hochscheidt, Dr. Gerhard Hofmann, Dr. Christine Holste, Eckhard Holz, Rolf Hörhold, Joachim Hotter, Dr. Bergit Jorger, Dr. Christian Kaiser, Dr. Klaus Kaspitza, Dr. Peter Kaut, Herrad Kaut, Dr. Horst A. Keller, Martina Keller, Kathrin Kersting, Rolf Kirschsiefen, Günther Klaus, Jürgen H. Knauf, Reinhard Köhler, Dr. Bernd Kramer, Wolfgang Krill, KROBO Stiftung c/o WP Vetriebsgesellschaft mbH, F. Kuchenbaecker, Egbert Kühl, Erwin Kühn, Eveline Kullmann–Stadlinger, Dr. Rudolf Lang, Gerhard Lehmann, Karl Lenk, Thomas Lenk, Johanna Leupold, Franz Liborius, J.B. Liebenstein, Helga Luibl, Dr. Hans–Jürgen Lörz, Dr. Dagmar Lau–Loskill, Phillip Lau–Loskill, Hans–Jürgen Lück, Günther Mann, Irene Marquardt individually and on behalf of IREMA GmbH & Co. KG, Eckehard Maruhn,

them of approximately $30,000,000 they invested to build and operate a shopping mall located in Washington state.

A number of defendants answered and appeared below.[2] These defendants include the original owner/developer of the mall, Washington Supermall Interests, L.P. ("WSI"), a Delaware limited partnership with offices in Texas; the four Texas limited partnerships in which appellants invested their funds (the "Texas limited partnerships")[3]; and a group referred to collectively as the "Rosche Entities."[4] However, defendant/appellee Farallon Capital Partners, L.P. ("Farallon") and each of the remaining defendants/appellees, sometimes referred to as the "Hapsmith Defendants,"[5] filed special appearances contesting the trial court's exercise of personal jurisdiction over them. The trial court granted the special appearances, and appellants filed this interlocutory appeal.[6]

Hans–Peter Maute, Karl Mauz, Gerhard Meinert, Cerstin Meisen, Dr. Hartmut Merk, Hans Otto Merl, Ursula Mersi, Klaus Meyer, Marietta Miemietz, Eva–Maria Miemietz, Werner Mitschke, Matthias Molitor, Dr. Maria Müller–Schuster, Hannelore Mürdel, Karl Nagel, Dr. Friedrich Niederquell, Hermann Georg Niemann, Dr. Bernd Onken, Michael Oppelt, Herbert Päffgen, Rolf Peltzer, Helmtrud Peter, Uwe Petri, Manfred Pfaller, Kreszentia Poppler, Dr. Dieter Prenz, Ferdinand Probst, Jr., Hans–Günther Prozesky, Helga Prozesky, Ulrich Quaas, Dr. Ingeborg Quasthoff, Bert Raabe, Aldo Rajko, Thomas Rang, Franz Rapp, Ursula Rapp, Lorenzo Ravagli, Dr. Hartwig Redecker, Karl Reichert, Dr. Birgit Reinhardt, Dr. Rupert Renftle, Doris Richter, Paul Ritzler, Eberhard Rösel, Alexander Röthinger, Herta Ruf–Adler, Siegfried Ruggaber, D. Hans–Joachim Ruhdel, Margarete Säger–Neureither, Gabriele E. Schallehn, Franz Schaus, Norbert Scheidacker, Dr. Christiane Schiltenwolf, Dagmar Schlösser, Bettina Schmans, Dr. Bernd Schmid, Dr. Hans Schmidt, Dr. Helmut Schmidt, Prof Hans–W. Schneider, Christel and Richard Schobert, Joost Schrader, Trustee, Dr. Ulrich Schröer, Stefan Schuch, Elisabeth Schulte–Braucks, Kathrin Schulz, Dr. Wilfried Schungel, Joachim Schutz, Johann Weber, Dr. Herbert Seele, Lothar Seewitz, Faruk Senoglu, Maria Senoglu, Rafael Sevilla, Elke Sommer, Dieter Spielhoff, Erika Spielhoff, Anita Springer, Dr. Egbert Steinrücke, Miechen Stumpp, Horst Sydow, Waltraut Tartsch, Ingo Thomas, Lüder Tidemann, Dr. K.H. Timmesfeld, Hermann Toepfer, Karl Wilhelm Trau, Bruno Trommer, Kayoko Tsutsumi–Stoehr, Inge Turmann, Günter Tews, Rolf and Magdelene Uebelgönne, Dr. Herald Ullmann, Prof. Dr. Jürgen Vollradt, Alfred Wachlin, Gerhard Waldmann, Eberhard Weber, Johann Weber (heir of Christine Weber), Dr. Andreas Weigel, Dr. Barbara Weigel, Helga Weigel, Dr. Hansjörg Weigel, Wolfgang Weigelt, Dr. Ingolf G. Welsch, Gudrun Wenke, Margit Werder, Erika Wermke, Brigitte Werner, Erwin Wertheimer, Angelika Wetzel, Wolfram Wiemann, Dr. Gertrud Wimmer, Wolfgang Wimmer, Dr. Heinrich Wirtz, Hans Wolfgang Zanders, Frank W. Zarges, Werner Zehnter, Ingeborg Zeljak, and Dietmar zur Heiden.

2. In any event, they are not parties to this appeal.

3. The Texas limited partnerships consist of Washington Supermall Investors, L.P., Washington Supermall Associates, L.P., Washington Supermall Partners, L.P., and Washington Supermall Co–Owners, L.P.

4. The Rosche Entities consist of Rosche Services Corporation, Rosche Interests Limited Partnership, Rosche Capital Corporation, and R.H. Development, L.P.

5. The "Hapsmith Defendants" consists of The Hapsmith Company, a California corporation; Hapsmith Development Corporation, a California corporation; and five California limited partnership in which Hapsmith Development Corporation served as general partner: Hapsmith–Auburn IV, L.P.; Hapsmith Interests IV, L.P.; Hapsmith Partners IV, L.P.; Hapsmith Properties III, L.P., and Hapsmith Properties IV, L.P.

6. Robert B. Evans also filed a special appearance, which the trial court granted in the same order granting the special appearances of Farallon Capital Partners, L.P. and the Hapsmith Defendants. Appellants listed Evans in their notice of appeal. However, appellants advance no argument in their brief

Appellants assert the trial court erred in overruling their objections to certain affidavits submitted in support of the Hapsmith Defendants' and Farallon's special appearances, and that the trial court erred in granting those special appearances. We conclude the trial court did not err in overruling certain of appellants' objections to the affidavits. Further, after a careful review of the pleadings and the evidence, we conclude the trial court did not err in granting the special appearances. Therefore, we affirm the trial court's order granting the special appearances.

## I. PERSONAL JURISDICTION

### A. Substantive Law

■ Texas courts may assert personal jurisdiction over a nonresident if it is authorized by the Texas long-arm statute and is consistent with federal and state constitutional due-process guarantees. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex.2002); *see* TEX. CIV. PRAC. & REM.CODE ANN. §§ 17.041–.045 (Vernon 1997 & Supp.2007). The long-arm statute allows Texas courts to " 'reach as far as the federal constitutional requirements of due process will allow.' " *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 806 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (acts constituting "doing business" within state for purposes of long-arm statute). Thus, a Texas court may exercise personal jurisdiction over a nonresident if doing so complies with federal due-process requirements. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex.2007). Those requirements are satisfied if: (1) the nonres-

ident defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

### 1. Nature of Contacts with Texas

■ The contacts relevant to a jurisdictional analysis are those through which the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (citing *Int'l Shoe Co.*, 326 U.S. at 319, 66 S.Ct. 154); *see Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex.2005). Only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *Michiana*, 168 S.W.3d at 785. Such contacts must be purposeful rather than random, fortuitous, or attenuated. *Id.; see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Further, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785. What is important is the quality and nature of the defendant's contacts with the forum state, rather than their number. *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 806.

### 2. Extent of Contacts—Specific and General Jurisdiction

on appeal as to the granting of Evans's special appearance. They have failed to preserve any complaint on appeal as to Evans. *See*

TEX.R.APP. P. 38.1(h). Therefore, we affirm the trial court's order granting special appearances as to Evans.

■ A nonresident defendant's contacts with the forum state meet the federal due-process minimum contacts standard if the contacts establish either "specific jurisdiction" or "general jurisdiction." *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795–96 (Tex.2002).

### a. Specific Jurisdiction

■ Specific jurisdiction exists if the defendant's alleged liability arises out of or is related to the defendant's activities conducted within the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *see also CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996). In other words, there must be "a substantial connection between [the nonresident's contacts with the forum] and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. Specific jurisdiction is not established merely by allegations or evidence that a nonresident committed a tort in the forum state or "directed a tort" at the forum state. *Michiana*, 168 S.W.3d at 790–92.

### b. General Jurisdiction

■ General jurisdiction exists if the defendant's contacts with the forum are continuous and systematic, whether or not the defendant's alleged liability arises from those contacts. *BMC Software Belgium*, 83 S.W.3d at 796; *CSR Ltd.*, 925 S.W.2d at 595. General jurisdiction is "dispute-blind," as it permits permit the court to "exercise jurisdiction over the

nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168–69 (Tex.2007). Thus general jurisdiction involves a more demanding minimum-contacts analysis than that involved in specific jurisdiction, with a substantially higher threshold for subjecting the out-of-state defendant to personal jurisdiction. *Id.* at 168. "Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.' " *Id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5). The relevant time period for assessing minimum contacts for general jurisdiction ends at the time suit is filed. *Id.* at 169.

### 3. Additional Due–Process Requirements

■ Federal due-process also requires the exercise of personal jurisdiction to comport with traditional notions of fair play and substantial justice. *BMC Software Belgium*, 83 S.W.3d at 795 (citing *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154).[7]

## B. Burden of Pleading/Proof

### 1. In General

---

7. In making this determination we evaluate the defendant's contacts in light of the following factors: (1) the burden on the nonresident defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *See Burg-*

*er King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 231. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 231.

The plaintiff bears the initial burden of pleading sufficient allegations to invoke the provisions of the Texas long-arm statute. *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985) (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex.1982)). Except as noted below, upon filing a special appearance the non-resident defendant assumes the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; *Siskind*, 642 S.W.2d at 438 (citing E. Wayne Thode, *In Personam Jurisdiction; Article 2031b, The Texas "Long Arm" Jurisdiction Statute; And the Special Appearance to Challenge Jurisdiction in Texas and Elsewhere*, 42 TEX. L.REV. 279, 322 (1964)). In other words, the defendant must disprove the existence of minimum contacts sufficient to establish personal jurisdiction over it—general, specific, or both—as alleged by the plaintiff. *See Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; Thode, *supra* at 322. However, absent allegations of any specific, purposeful act through which the defendant can be said to have sought a benefit by "availing itself of the jurisdiction," *Michiana*, 168 S.W.3d at 785, evidence that a defendant is a nonresident is sufficient to meets its burden. *See Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex.App.-Dallas 1993, writ denied) (citing *Siskind*, 642 S.W.2d at 438).

## 2. Alter–Ego

If the plaintiff seeks to assert jurisdiction over a nonresident defendant under an alter-ego theory, the plaintiff has the burden of proving its alter-ego allegation. *PHC–Minden, L.P.*, 235 S.W.3d at 173. The supreme court has noted that piercing a corporate veil for purposes of liability ("substantive veil-piercing") differs from imputing one entity's contacts to another for jurisdictional purposes ("jurisdictional veil-piercing"), and that whether the plaintiff contends that a defendant committed fraud is not relevant for purposes of jurisdictional veil-piercing. *Id.* at 174–75. In the context of a parent and subsidiary corporation, the supreme court outlined the factors relevant to jurisdictional veil-piercing as follows:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiff must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*Id.* at 175 (quoting *BMC Software Belgium*, 83 S.W.3d at 799).

## C. Standard of Review

Whether personal jurisdiction exists is a question of law, and we review the trial court's ruling on a special appearance de novo. *BMC Software Belgium*, 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *Id.* If the trial court does not issue findings of fact, we imply all such findings necessary to support the judgment that are supported by the evidence. *See id.* at 795. However, when a reporter's record is included in the appellate record, the trial court's findings of fact—express or implied—are not conclusive, and are subject to challenge on evidentiary sufficiency grounds. *See id.* A legal sufficiency challenge to a finding of fact fails if there is more than a scintilla of evidence to support the finding. *See id.* In conducting a fac-

tual sufficiency review, we may set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Hoffmann v. Dandurand,* 180 S.W.3d 340, 345 (Tex.App.-Dallas 2005, no pet.).

## II. BACKGROUND

### A. Substantive Allegations[8]

In the 1990s, appellants were solicited by Martin Vogelbacher, a German national, to invest in the Washington Supermall, which was being developed by WSI. WSI is a Delaware limited partnership with a number of limited partners, including the four Texas limited partnerships; Hapsmith Development Corporation; and Hapsmith Interests IV, L.P. WSI had one general partner, RH Development, L.P. ("RHD"), a Delaware limited partnership with its principal office in Texas. (In turn, RHD's general partners included Hapsmith Development Corporation and Rosche Capital Corporation, and Hapsmith Interests IV, L.P. was a limited partner.) As a result of Vogelbacher's solicitations, appellants invested approximately $30,000,000 in one or more of the four Texas limited partnerships.

After appellants made their investment, Farallon guaranteed a letter of credit to the senior lender, which is not alleged to be a Texas entity, and was referred to as an "LC provider."[9] Thus Farallon became involved in the "debt component" of the Washington Supermall. As collateral on its guarantee, Farallon also became a limited partner of WSI.[10]

According to appellants, their entire investment was improperly diverted from the Washington Supermall. Generally, appellants allege that "almost immediately" after they invested in the project, fees for "development" and "syndication" were paid to Rosche Finanz (the Rosche Entities' parent company), Hapsmith Development Corporation, Hapsmith Properties III, L.P., and others. Next, in what appellants characterize as a "Ponzi Scheme/ Shell Game," the money appellants invested in the Texas limited partnerships was "loaned" to other investors and to entities unrelated to the project. Thereafter, and "with the support of" other defendants (including Farallon), the Hapsmith Defendants and the Rosche Entities sold an approximate 70% ownership interest in the mall property to "a purportedly unrelated purchaser, Glimcher Properties Limited Partnership." This sale violated provisions in WSI's limited partnership agreement requiring notice of such a transfer to a group of "advisors" that included three of the Texas limited partnerships (in which appellants had invested their funds). From the proceeds of this sale, WSI made "preferential payments" to some of its limited partners, including Hapsmith Development Corporation, Hapsmith Interests IV, L.P. and Farallon, but not the Texas limited partnerships in which appellants had invested. Finally, as part of the sale, WSI borrowed money from Glimcher and an associated company, Nomura, pledging as security an addition-

---

8. The following information is taken principally from appellants' pleadings.

9. A predecessor of Farallon Capital Management, L.L.C. ("FCM") was an investment advisor to Farallon, among others. That predecessor entity recommended the Washington Supermall investment to Farallon. Neither FCM nor its predecessor entity are parties to this litigation.

10. Foothill Capital Corporation, another defendant but not a party on appeal, also guaranteed the letter of credit and became an "LC provider" and a limited partner in WSI.

al 27% ownership interest in the mall property. According to appellants, WSI transferred the proceeds of this loan to "one of the Rosche Entities." When WSI did not repay the loan, Glimcher (through Nomura) foreclosed and acquired the remaining 27% interest in the mall property.[11] Appellants alleged that, as a result of these transactions, their investment was "a total loss."

Appellants asserted the following causes of action: accounting, statutory fraud in stock and real estate transactions, and common law and constructive fraud (against the Rosche Entities and the Hapsmith Defendants); breach of duty of trust and confidence/fiduciary duty (against the Rosche Entities, the Hapsmith Defendants, an accounting firm, and a law firm and one of its attorneys); and conspiracy, aiding and abetting breach of fiduciary duty, and unjust enrichment (against all defendants). Appellants also requested a constructive trust over any wrongfully appropriated funds. Lastly, appellants alleged "alter ego/piercing the corporate veil/single business entity" among the "venture Defendants."

### B. Jurisdictional Allegations

Appellants' Third Amended Petition contains three paragraphs—paragraphs 270 through 272—relating to personal jurisdiction over non-resident defendants. These paragraphs, which will be discussed further herein, are somewhat vague as to the extent of each appellee's contacts with Texas. However, it is clear appellants asserted that: (1) each appellee was subject to both specific and general jurisdiction in Texas; and (2) Hapsmith Development Corporation was the alter ego of each of the other Hapsmith Defendants, at least for jurisdictional purposes.

Each of the Hapsmith Defendants and Farallon filed a special appearance supported by evidence. Appellants filed a response to the special appearances, supported by evidence, and also filed objections to some of the Hapsmith Defendants' and Farallon's evidence. As discussed in more detail below, the trial court overruled appellants' objections and signed an order granting the special appearances, without issuing findings of fact.

Appellants filed this interlocutory appeal of the trial court's order. See TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2007). In their first issue, appellants contend the trial court erred by not sustaining their objections to appellees' evidence. In their second issue, appellants argue their allegations and evidence support a finding of both general and specific jurisdiction over appellees that meets the standards of fair play and substantial justice.

### III. OBJECTIONS TO AFFIDAVITS

Each of the Hapsmith Defendants filed a special appearance supported by an affidavit of Frederick Nicholas. In his affidavit in support of Hapsmith Development Corporation, Nicholas stated that he was "under no legal disability," had "personal knowledge of the facts stated in this [a]ffidavit," was "authorized to execute this [a]ffidavit on behalf of Hapsmith Development Corporation," and was its chairman.[12]

Farallon's special appearance was supported, *inter alia*, by a supplemental affidavit from Mark Wehrly. In it Wehrly

---

11. Appellants alleged that "Hapsmith—through its agreements with Rosche—took the last 3%."

12. Nicholas's other affidavits included similar language as to his personal knowledge and his relationship with the Hapsmith Defendant on behalf of which the respective affidavit was filed.

stated he was a managing member and general counsel of the investment manager of Farallon, FCM, and "[b]ased on my position and my review of the relevant corporate documentation," he had personal knowledge of the matters discussed in the affidavit.

Appellants objected to Nicholas's affidavits, asserting they were not made on personal knowledge. *See* TEX.R. CIV. P. 120a(3) (requiring affidavits offered in special appearance "shall be made on personal knowledge"). Appellants also objected to Wehrly's supplemental affidavit because it failed to affirmatively show how he had personal knowledge. *See* TEX.R. CIV. P. 120a. The trial court overruled appellants' objections. In their first issue, appellants contend the trial court erred in overruling their objections.

According to appellants, Nicholas's deposition testimony shows that: (1) he had no personal knowledge because he admitted his memory was poor; and (2) certain matters, addressed in both Nicholas's deposition and affidavits, were not performed by Nicholas himself, but by the president of the Hapsmith Development Company (Jeffrey Oliphant), and therefore Nicholas did not have personal knowledge of them.

■ However, the requirements of rule 120a are met by an affidavit that is clear, definite, and unequivocal, and unless there is something in the affidavit itself to indicate to the contrary, we accept it for what it appears on its face to be. *See Omniplan, Inc. v. New Am. Dev. Corp.*, 523 S.W.2d 301, 304 (Tex.Civ.App.-Waco 1975, no writ) (rejecting argument that testimony of affiant at special appearance hearing showed hearsay basis of affidavit, citing *Red Star Fertilizer Co. v. Zuck*, 267 S.W.2d 894, 895 (Tex.Civ.App.-Galveston 1954, no writ)); *see also Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc.*, 12 S.W.3d 859, 866–67 (Tex.App.-Texarkana 2000, no pet.) (affidavits "stat[ing] unequivocally that the affiants have personal knowledge of all the facts" adequate); *Jackson T. Fulgham Co. v. Stewart Title Guar. Co.*, 649 S.W.2d 128, 130 (Tex.App.-Dallas 1983, writ ref'd n.r.e.) (affidavit made on personal knowledge when affiant's statement he is "vice-president and agent" of company shows how he learned or knew of facts).

■ The admission and exclusion of evidence is subject to trial court's sound discretion. *See State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex.2001). We conclude the trial court did not abuse its discretion in overruling appellants' objections to the affidavits based on Rule 120a.[13] Accordingly, we resolve appellants' first issue against them to this extent.

## IV. JURISDICTION

In their second issue, appellants assert the trial court erred by "failing to rule that Appellees had not met their burden to negate all possible grounds for jurisdiction" and by "granting Appellees' Special Appearances against the great weight of the evidence submitted into the record[.]" Each appellee responds that appellants did not allege any jurisdictional facts as to it— i.e., any specific, purposeful act by the defendant through which it can be said to have sought a benefit by "availing itself of the jurisdiction." *See Michiana*, 168 S.W.3d at 785. As a result, each appellee

13. Appellants also objected to two additional statements in Nicholas's affidavits: that each respective Hapsmith Defendant "is not now engaged and has not engaged in the past in business in the State of Texas" and "has not committed any tort, in whole or in part, in the State of Texas." Appellants argue these state- ments are conclusory. Appellants objected to a second Wehrly affidavit as well. As we do not consider Wehrly's other affidavit or these other statements in Nicholas's affidavits, we need not address appellants' other arguments concerning the admissibility of the affidavits. *See Grotjohn*, 12 S.W.3d at 867.

contends that its undisputed evidence that it is not a resident is sufficient to met its burden of negating all potential bases of jurisdiction against it. *See Hotel Partners*, 847 S.W.2d at 633.

## A. Allegations of Jurisdictional Facts

Appellants alleged that the court had both specific and general personal jurisdiction over the Hapsmith Defendants—and in particular Hapsmith Development Corporation—and over Farallon. Appellants' operative pleadings contain three paragraphs—Paragraphs 270 through 272—related to the court's exercise of personal jurisdiction over the nonresident defendants. These paragraphs are set forth below in their entirety.[14]

We have reviewed appellants' operative pleadings in their entirety, with particular

14. Appellants' (plaintiffs below) third amended petition alleges:

270. In addition, personal jurisdiction is properly asserted in this case against those Defendants who are not Texas residents in that these Defendants committed torts in whole or in part in this state, and/or because of the contacts, contracts and other business dealings done by these Defendants in the state of Texas. For example, Plaintiffs assert that Texas was the hub of the fraudulent and other improper conduct at issue in this case in that the bank accounts used by Defendants to abscond with Plaintiffs['] investment monies were based in Texas, and most, if not all, of the Plaintiffs' monies were moved by certain Defendants to other Defendants (such as the Hapsmith Defendants, Farallon, and Foothill) from or through these Texas banks. Furthermore, Plaintiffs further assert that Texas was also the hub of the fraudulent and improper conduct in this case in that the critical investment entities (Washington Supermall Investors, Ltd., Washington Supermall Associates, Ltd., Washington Supermall Partners, Ltd., Washington Supermall [Co–Owners, L.P.], Washington Supermall Interests, LP), and their general partners ( [RHD], Rosche Capital Corp., and Rosche Interests Limited Partnership) and [sic] are either Texas entities, or maintain their principal offices in the state of Texas, and it was through these entities by which Defendants effectuated many of their improper actions. For example, the Washington Supermall Interests, LP tax returns show that, at the direction of the Rosche and Hapsmith Defendants, this Texas-based limited partnership improperly made preferential partnership distributions to certain Hapsmith Defendants, Farallon, Foothill, and other Defendants. In addition, these same Hapsmith Defendants and the Rosche De-

fendants also improperly agreed without authorization to cause the Texas-based Washington Supermall Interests, LP to sell the Washington Supermall asset without the approvals required in the limited partnership agreements. Furthermore, these same Hapsmith and Rosche entities also modified—without authorization—the terms of the limited partnership agreements of the Washington Supermall entities to ensure that Plaintiffs learned nothing about the transaction. Each of these incidents is discussed in more detail below. 271. In addition, this Court has both specific and general personal jurisdiction over Defendant Farallon. With regard to general jurisdiction, Farallon has invested, directly or indirectly, in deals in or involving the state of Texas on approximately fifty (50) occasions in the past ten (10) years. These investments were done through specific single-purpose entity agents created by Farallon to implement these investments. With regard to specific jurisdiction and the Washington Supermall transactions at issue in this case, Farallon has: (1) used its agents to perform pre-investment investigations in Texas of parties to the transaction relying on the protections of the law of Texas, for instance including UCC–1 searches; (2) conducted detailed negotiations with Texas citizens and entities, through numerous fax and telephone communications; (3) required at least two legal opinions from Texas lawyers on issues of Texas law as a condition for participating in the transactions; (4) contracted with numerous Texas entities or entities domiciled in Texas, with at least part of these contracts being performed in the state of Texas; (5) exercised substantial control over entities domiciled in the state of Texas perhaps to the extent of becoming a de facto general

attention to Paragraphs 270 through 272. We question whether these allegations are sufficient to invoke personal jurisdiction under the Texas long-arm statute over any of the Hapsmith Defendants or over Farallon. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042; *see also Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; *Thode, supra* at 322. However, for purposes of our analysis, will assume without deciding that appellants' allegations are sufficient.

## B. Imputed Contacts Among Defendants

Before we analyze each defendant's contacts with the forum, however, we must first address appellants' alter-ego argument with respect to the Hapsmith Defendants. In paragraph 272, appellants alleged that Hapsmith Development Corporation was the alter-ego of the other Hapsmith Defendants. On appeal, appellants argue that Hapsmith Development Corporation was the general partner of the other Hapsmith Defendants and "the Hapsmith entities clearly were 'fused' for the purposes of the Supermall transaction."

As noted earlier, appellants bear the burden of proof with respect to any jurisdictional veil-piercing theory. *PHC–Minden, L.P.*, 235 S.W.3d at 173. Further, absent findings of fact, we assume the trial court found against appellants on this issue, provided such an implied finding is supported by the evidence. *See BMC Software Belgium*, 83 S.W.3d at 795.

█ In his deposition, Nicholas testified there was no ownership interest between Hapsmith Development Corporation and The Hapsmith Company. Nicholas also stated that the Hapsmith Company "didn't own anything." The Hapsmith Defendants' brief acknowledges that the Hapsmith Development Company is the general partner of the Hapsmith limited partnerships. But appellants do not direct us to evidence in the record that Hapsmith Development Corporation controlled the internal business operations and affairs of

---

partner of a limited partnership based in Texas; and (6) invoked the protection of the laws of the state of Texas when it took assignments of partnership from Texas entities, and made UCC filings in the state of Texas to secure its position.

272. In addition, the Court has both specific and general personal jurisdiction over the Hapsmith Defendants for many of the same reasons. Hapsmith Development Corporation, the sole general partner and alter ego of virtually all of the Hapsmith Defendants in this case, has done business in Texas for years, both as a general partner of Texas entities or an entities [sic] with their principal office in Texas (such as [RHD], Hapsmith–Rosche Washington, a Texas General Partnership, and other entities), and through its sole purpose entity agents (including the Texas Supermall entities and the Hapsmith–Texas entity). In this manner, Hapsmith Development Corporation and the entities it controls and operates through have been doing business in the state of Texas at least since 1993. In

addition, with regard to specific jurisdiction and the Washington Supermall transactions at issue in this case, Hapsmith Development Corporation and its agents, alter egos, and sole purpose entities (including Hapsmith Properties III LP, Hapsmith Properties IV LP, Hapsmith Interests IV LP, Hapsmith Auburn IV LP, Hapsmith Partners IV LP, and The Hapsmith Company) have: (1) used their agents to perform pre-investment investigations in Texas of parties to the transaction relying on the protections of the law of Texas, for instance including UCC–1 searches; (2) conducted detailed negotiations with Texas citizens and entities, through numerous fax and telephone communications; (3) required legal opinions from Texas lawyers on issues of Texas law as a condition for participating in the transactions; (4) contracted with numerous Texas entities or entities domiciled in Texas, with at least part of these contracts being performed in the state of Texas; and (5) exercised substantial control over entities domiciled in the state of Texas.

any other Hapsmith Defendant to the extent the two entities effectively ceased to be separate. We cannot conclude that the fact of partnership, without more, constitutes such evidence, much less that it compels a finding that Hapsmith Development Corporation was an alter-ego of the other Hapsmith Defendants for jurisdictional purposes. *See PHC–Minden, L.P.,* 235 S.W.3d at 175–76; *BMC Software Belgium,* 83 S.W.3d at 799. Accordingly, we conclude the trial court's implied finding that appellants failed to prove that Hapsmith Development Company was the alter-ego of the other Hapsmith Defendants is supported by the evidence. We resolve appellants' second issue against them to the extent they argue they established a basis for imputing, for jurisdictional purposes, one defendant's contacts with the forum to another defendant.[15]

### C. Jurisdictional Minimum Contacts Analysis

We now turn to the evidence of each appellees' respective contacts with Texas. We will review any evidentiary disputes as to that appellee's contacts and determine whether the evidence supports an implied finding against the existence of a particular jurisdictional fact. *See BMC Software Belgium,* 83 S.W.3d at 794. We then review de novo the trial court's decision that the exercise of personal jurisdiction over that appellee does not comply with federal due-process requirements. *See Moki Mac,* 221 S.W.3d at 575; *BMC Software Belgium,* 83 S.W.3d at 794.

### 1. Hapsmith Development Corporation

Appellants contend the evidence shows "significant and intentional contacts with the state of Texas" by the Hapsmith Defendants spanning more than ten years that establish contacts sufficient to support specific and general jurisdiction. We examine the record regarding these purported contacts with respect to each of the Hapsmith Defendant in a (generally) chronological order.

Appellants argue that Hapsmith Development Corporation's contacts included a meeting in Texas between Hapsmith representatives and Vogelbacher concerning the Washington Supermall project. Nicholas testified he and Oliphant met Vogelbacher and his attorneys in Dallas in the late 1980s or early 1990s. The purpose of the meeting was to meet the Rosche Entities' representatives, determine "what their business was ...," and determine whether Vogelbacher and the Rosche Entities were interested in the Washington Supermall. According to Nicholas, the Texas meeting "was to meet with them and see what kind of people they were and they wanted to see who we were...." But Nicholas did not recall discussing any business relationship at the Dallas meeting, though such a relationship was discussed later at a meeting in Germany. Moreover, Nicholas also testified the meeting occurred in Dallas because Vogelbacher was coming to the United States and his attorneys were located in Dallas.

15. Appellants also alleged—albeit not within the jurisdictional allegations of their pleadings—a "single-business entity" theory for imputing the acts of each of the "venture defendants" to each other for purposes of liability. The supreme court has never endorsed single-business enterprise as a theory for jurisdictional veil-piercing. *PHC–Minden, L.P.,* 235 S.W.3d at 173. Even if appellants' pleadings were construed to allege a "single-business entity" basis for jurisdictional veil-piercing, however, appellants do not assert this argument on appeal; thus they have presented nothing for review as to that theory. *See* Tex.R.App. P. 38.1(h).

Thus, the evidence is conflicting whether the purpose of the meeting was solicitation of business in Texas and as to the actual discussions that occurred. *Cf. Burger King Corp.,* 471 U.S. at 479, 105 S.Ct. 2174 (franchisee "reached out beyond" his home state to negotiate long-term contract involving regulation by company in forum state). There is some evidence that the location of the meeting in Texas was fortuitous. *See id.* at 475 n. 18, 105 S.Ct. 2174; *Michiana,* 168 S.W.3d at 785. We assume the trial court impliedly found the meeting did not constitute purposeful availment, and we cannot conclude that the weight of the evidence opposing this finding is so overwhelming as to render it clearly wrong or unjust. *See Hoffmann,* 180 S.W.3d at 345.

Appellants contend that Hapsmith Development Corporation conducted negotiations with the Texas-based Rosche Entities through "numerous fax and telephone communications" that required legal opinions from Texas lawyers and other documents sent by the Rosche Entities' attorneys in Dallas to the California offices of Hapsmith Development Corporation, The Hapsmith Company, and their California attorneys. However, the exchange of communications between Texas and California in the course of developing and carrying out the partnership agreement is in itself insufficient to constitute purposeful availment. *See Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir.1986); *Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc.,* 80 S.W.3d 723, 730 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Similarly, communications with the Rosche Entities' Texas attorneys and re-

ceipt of legal opinions do not establish purposeful availment. *Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.,* 84 S.W.3d 830, 839 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

Appellants also contend that, as part of Hapsmith Development Corporation's due diligence, its agents performed UCC investigations in Texas. It is undisputed that searches of Texas UCC databases for information on WSI and certain Rosche Entities in Texas were conducted. However, such due diligence does not show purposeful availment. *See id.* at 838.

Appellants argue that Hapsmith Development Corporation became a general partner in Texas-based entities, including RHD and, later, Hapsmith–Rosche Washington partnership (which was to exercise an option on Phase II of the Washington Supermall). But merely contracting with a Texas corporation does not satisfy the minimum contacts requirement. *See Burger King Corp.,* 471 U.S. at 478–79, 105 S.Ct. 2174; *Reef Exploration, Inc.,* 84 S.W.3d at 837; *TeleVentures, Inc. v. Int'l Game Tech.,* 12 S.W.3d 900, 908 (Tex.App.-Austin 2000, pet. denied). Moreover, a partnership's contacts are not imputed to partners with no individual contacts with the forum state. *See Salem Radio Representatives, Inc. v. Can Tel Mkt. Support Group,* 114 F.Supp.2d 553, 557 (N.D.Tex.2000). The contacts of each defendant must be considered, not the aggregated contacts of defending parties. *See Rush v. Savchuk,* 444 U.S. 320, 331–32, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). Accordingly, the fact of partnership alone is insufficient to show purposeful availment.[16]

**16.** Appellants also assert that Hapsmith Development Corporation exercised substantial control over Hapsmith–Rosche Washington partnership and the Texas limited partnerships. However, we have already sustained the trial court's implied finding rejecting ap-

pellants' allegation of an alter-ego relationship between Hapsmith Development Corporation and the Hapsmith–Rosche Washington partnership. And appellants did not allege that Hapsmith Development Corporation had an alter-ego relationship with any non-Haps-

Appellants contend that at least part of the contracts were performed in Texas. First, they contend that money was improperly transferred by WSI. Specifically, appellants argue that Hapsmith Development Corporation agreed to a redemption by Hapsmith Properties III, L.P. (as a WSI limited partner) upon the admission of one of appellants' limited partnerships and its investors' funds. However, the Redemption Agreement shows this action was a corporate action by WSI's general partner, RHD, agreed to by both its partners, Hapsmith Development Corporation and Rosche Capital Corporation. Further, other than the assertion that Hapsmith Development Corporation "agreed," there is no evidence as to the acts, if any, of Hapsmith Development Corporation concerning the redemption or transfer of funds, or how those acts relate to Texas. And, to the extent appellants argue their evidence shows the Hapsmith Development Corporation "acted together" with Vogelbacher and the Rosche Entities "to operate the central entity"—WSI—for their own benefit, the supreme court has declined to recognize the assertion of personal jurisdiction over a nonresident defendant based solely on the effects or consequences of an alleged conspiracy with a resident of the forum state. *See Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex.1995); *Siskind*, 642 S.W.2d at 434, 437–38; *Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 10 (Tex.App.-San Antonio 2004, pet. denied). There was no evidence of any receipt of payments by any Hapsmith defendant in Texas, and such receipt of money is insufficient to show purposeful availment. *See Holt*, 801 F.2d at 778; *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 763 (Tex.1977); *TeleVentures, Inc.*, 12 S.W.3d at 910.

Second, appellants argue that certain agreements required Hapsmith Development Corporation to give notice in Texas. However, the two documents to which appellants refer—the Voting Trust Agreement and the First Amended Partnership Agreement of RHD—show that Hapsmith Development Corporation was to *receive* notices from separate entities. Moreover, both of these documents provided they were governed by the laws of the state of Delaware.

Another document providing for notice was WSI's Second Amended and Restated Limited Partnership Agreement. This agreement provided it was to be governed by Delaware law that that WSI's general partner—RHD—"shall be solely responsible for the overall management and control of [WSI]'s business and affairs...." The agreement provided for an advisory council, which included representatives of three of appellants' Texas limited partnerships and other categories of investors, and for notice to this council by the general partner—RHD—not Hapsmith Development Corporation. Thus, the record shows no dispute as to any act by Hapsmith Development Corporation in Texas related to notices. Moreover, it is undisputed that a purpose of the Second Amended and Restated Limited Partnership Agreement of WSI was to finance the development of a project in the state of Washington. Place of performance of the contract and specifying that the agreement was governed by Delaware law are factors that weigh against purposeful availment in Texas. *See Burger King Corp.*, 471 U.S. at 482, 105 S.Ct. 2174; *Blair Commc'ns, Inc.*, 80 S.W.3d at 730.

mith Defendant entity. Thus we need not further address Hapsmith Development Cor-

poration's control over other entities.

Appellants argue that Hapsmith Development Corporation's contacts with Texas included development of the Texas Supermall in Irving, Texas and meetings in Texas among Vogelbacher, Nicholas, and Oliphant on that matter. In his deposition, Nicholas testified that separate entities, including Texas SuperMall Interests L.P., were formed to investigate the possibility of building a discount mall, the Texas Supermall. According to Nicholas, Hapsmith Development Corporation was not involved with the Texas SuperMall, and none of the entities were associated with The Hapsmith Company. Nicholas testified that the land was never purchased for the Texas SuperMall. There is evidence that Texas SuperMall Interests, L.P. made a loan to Washington SuperMall Interests, L.P. in 1995, but there is no evidence imputing the contacts of Texas SuperMall Interests, L.P. to any Hapsmith defendant. *See Rush,* 444 U.S. at 331–32, 100 S.Ct. 571. This evidence does not show purposeful availment.

We have reviewed the evidence relied on by appellants and have concluded either that there is a factual dispute as to a jurisdictional fact, thus supporting an implied finding against such fact, or that the evidence relates to a contact that is not the type of contact that shows Hapsmith Development Corporation purposefully availed itself of the benefits and protections of Texas law.

Nicholas's affidavit in support of Hapsmith Development Corporation's special appearance states, in part, that it: (1) was a California corporation; (2) did not maintain a registered agent for service of process in Texas, nor was it required to maintain a registered agent for service of process in Texas; (3) did not maintain a place of business in Texas; (4) had no employees in Texas; and (5) did not own or lease real property in Texas. These un-

disputed jurisdictional facts support the trial court's implied finding that Hapsmith Development Corporation lacked the minimum contacts sufficient to support either specific or general jurisdiction. Accordingly, the trial court properly concluded that it lacked personal jurisdiction over Hapsmith Development Corporation. *See Michiana,* 168 S.W.3d at 785.

## 2. The Hapsmith Company

First, appellants argue The Hapsmith Company improperly received money from WSI as a development fee in connection with the Washington Supermall transaction. However, there is no evidence this money, or any other payment to The Hapsmith Company, was received in Texas. And even if it were, such receipt of money is insufficient to show purposeful availment. *See Holt,* 801 F.2d at 778; *U–Anchor Advertising, Inc.,* 553 S.W.2d at 763; *TeleVentures, Inc.,* 12 S.W.3d at 910. Receiving payment from WSI, a Delaware limited partnership with offices in Texas, does not show conduct by The Hapsmith Company purposefully directed towards Texas. *See Case v. Grammar,* 31 S.W.3d 304, 310 (Tex.App.-San Antonio 2000, no pet.) (no purposeful direction towards Texas when California residents borrowed money from Nevada limited partnerships funded by limited partners in Texas), *disapproved of on other grounds by BMC Software Belgium,* 83 S.W.3d at 794 n. 1.

Second, appellants point to a letter from The Hapsmith Company in California establishing a priority of payments from WSI if the Glimcher deal was completed. As we noted above, the exchange of communications between Texas and California in the course of developing and carrying out the partnership agreement is in itself insufficient to constitute purposeful availment. *See Holt Oil & Gas Corp.,* 801 F.2d at 778; *Blair Commc'ns, Inc.,* 80 S.W.3d at 730. These are not the types of contact

that show The Hapsmith Company pur-posefully availed itself of the benefits of and protections of Texas law sufficient for specific or general jurisdiction. *See BMC Software Belgium,* 83 S.W.3d at 798.

■ In his affidavit in support of The Hapsmith Company's special appearance, Nicholas stated in part that The Hapsmith Company: (1) was a California corpora-tion; (2) did not maintain a place of busi-ness in Texas; (3) had no employees in Texas; did not own or lease real property in Texas; (4) and was qualified to do busi-ness in Texas in 1985, but forfeited its Certificate of Authority in January 1988, and had not engaged in any business in Texas subsequent to January 1988. These undisputed jurisdictional facts support the trial court's implied finding that The Haps-mith Company lacked the minimum con-tacts sufficient to support either specific or general jurisdiction. Accordingly, the trial court properly concluded that it lacked personal jurisdiction over The Hapsmith Company. *See Michiana,* 168 S.W.3d at 785.

### 3. The Hapsmith Limited Partner-ships

■ Appellants argued that two of the Hapsmith Limited Partnerships—Haps-mith Properties III, L.P. and Hapsmith Interests IV, L.P.—improperly received "redemptions" or payments as limited partners of WSI, when none of their Texas limited partnerships received any pay-ments at all. In the record before us, there is no evidence this money, or any other payments to any Hapsmith limited partnership, was received in Texas. And again, receipt of money is insufficient to show purposeful availment. *See Holt,* 801

F.2d at 778; *U–Anchor Advertising, Inc.,* 553 S.W.2d at 763; *TeleVentures, Inc.,* 12 S.W.3d at 910. This is not the type of contact that shows the Hapsmith limited partnerships purposefully availed them-selves of the benefits and protections of Texas law sufficient for specific or general jurisdiction. *See BMC Software Belgium,* 83 S.W.3d at 798.

■ In his affidavits in support of each of the Hapsmith limited partnerships' spe-cial appearances, Nicholas stated in part that each defendant: (1) was a California limited partnership [17]; (2) did not maintain a registered agent for service of process in Texas, nor was it required to maintain a registered agent for service of process in Texas; (3) did not maintain a place of business in Texas; (4) had no employees in Texas; (5) did not own or lease real prop-erty in Texas; and (6) other than the retention of legal counsel for representa-tion in this suit, it had not entered into any contract by mail or otherwise with a Texas resident which contract was performable in Texas. These undisputed jurisdictional facts support the trial court's implied find-ing that the Hapsmith limited partnerships lacked the minimum contacts sufficient to support either specific or general jurisdic-tion. Accordingly, the trial court properly concluded that it lacked personal jurisdic-tion over The Hapsmith Company. *See Michiana,* 168 S.W.3d at 785.

### 4. Farallon

■ Appellants argue the evidence shows that Farallon's contracts regarding the letter of credit established minimum contacts. There was testimony that the negotiations regarding the letter of credit were conducted primarily by telephone

---

**17.** This is Nicholas's statement regarding Hapsmith Interests IV, L.P., Hapsmith Part-ners IV, L.P., and Hapsmith Properties IV, L.P. In his affidavits in support of the special appearances of Hapsmith–Auburn IV, L.P. and Hapsmith Properties III, L.P., he states each entity "is a limited partnership orga-nized under the laws of California."

between Oliphant and Jason Fish, an employee of FCM, Farallon's investment advisor. Fish testified that he never traveled to Texas regarding the WSI matter. There was evidence that no Farallon representative traveled to Texas for the Washington Supermall project. Such lack of evidence of presence in Texas related to this project supports an implied finding against the existence of this jurisdictional fact.

Appellants also rely, as they do in regard to Hapsmith Development Company, on UCC searches in Texas. As noted above, evidence of UCC searches does not show purposeful availment. *See Holt,* 801 F.2d at 778; *TeleVentures, Inc.,* 12 S.W.3d at 910. There is also evidence that Farallon's secured interest in the Supermall project was perfected by UCC filings in Texas. But filing UCC financing statements in Texas does not show purposeful availment. *See id.; accord IRA Res., Inc. v. Griego,* 161 S.W.3d 248, 257–58 (Tex. App.-Corpus Christi 2005) (citing *Goehring v. Superior Court,* 62 Cal.App.4th 894, 73 Cal.Rptr.2d 105, 113 (1998)), *rev'd on other grounds,* 221 S.W.3d 592 (Tex.2007) (per curiam).

Appellants also rely on evidence showing that documents, including contracts and legal opinions, were sent by WSI's Texas attorneys and received by Farallon's California attorneys. However, as we concluded above, the exchange of communications between Texas and California in the course of developing and carrying out the partnership agreement is in itself insufficient to constitute purposeful availment, as are communications among attorneys and receipt of legal opinions from Texas attorneys. *See Holt Oil & Gas Corp.,* 801 F.2d at 778; *Reef Exploration, Inc.,* 84 S.W.3d

at 839; *Blair Commc'ns, Inc.,* 80 S.W.3d at 730.

Appellants argue that certain of the documents require notice be provided to Texas entities by parties to those agreements, including Farallon. However, the four documents on which appellants rely contain general notice provisions and do not single out Farallon as providing any notice.[18] Appellants point to no evidence showing that Farallon in fact provided any notice to an entity in Texas pursuant to these provisions. All of these documents provide that the governing law is Washington or Delaware. This factor weighs against any finding of purposeful availment. *See Burger King Corp.,* 471 U.S. at 482, 105 S.Ct. 2174.

Appellants also argue that over the years Farallon made numerous investments in Texas through FCM, its investment advisor, or one of FCM's agents. There was evidence that Farallon was an investment entity that has no employees, officers or directors. It had approximately 450 limited partner investors. Wehrly stated:

> In making private equity investments in assets located in Texas—such as investments in real estate—Farallon generally will purchase a passive membership interest in a Delaware limited liability company which invests in a Texas limited partnership. Farallon makes thousands of investments every year, but in its entire history, has made fewer than twenty-five (25) such investments in companies that invest in Texas real estate, and currently holds fewer than ten (10) such investments.

Wehrly testified that Farallon did not purchase or sell "physical tangible assets";

---

18. These documents are the Reimbursement Agreement, the Second Amended and Restated Limited Partnership Agreement of WSI, the Subordination Agreement, and the Security Agreement, Pledge and Assignment.

rather, it bought and sold "securities and instruments." We conclude this evidence does not show purposeful availment of the privilege of conducting business in Texas by either Farallon or FCM. *See Bryant v. Roblee,* 153 S.W.3d 626, 630–31 (Tex.App.-Amarillo 2004, no pet.) (holding nonresident corporation's ownership of loans secured by liens on Texas real property insufficient to show purposeful availment). Our review of the record reveals no support for appellants' contention that FCM, Farallon's investment advisor, came to Texas concerning these investments.

Appellants also argue that Foothill Capital Corporation, which has not contested jurisdiction in this matter, acted as agent for Farallon. Appellants cite no authority that an entity's mere failure to contest personal jurisdiction is sufficient to attribute that entity's actions to a principal. In addition, even if documents, as noted above, stated that Foothill Capital Corporation was acting as the agent for the LC providers, nothing in the record shows contacts by Foothill Capital Corporation that were different from those by Farallon, which we have decided above do not show purposeful availment.

We have reviewed the evidence relied on by appellants and have concluded either that there is a factual dispute as to a jurisdictional fact, thus supporting an implied finding against such fact, or that the evidence relates to a contact that is not the type of contact that shows Farallon purposefully availed itself of the benefits and protections of Texas law. In his supplemental affidavit in support of Farallon's amended special appearance, Wehrly stated that Farallon: (1) was a California limited partnership with its principal place of business in California; (2) did not maintain a registered agent for service in Texas; (3) did not have, and never had, any employees in Texas; (4) did not maintain, and never maintained, an office in Texas; (5) for the last ten years, had followed all the necessary organizational formalities to maintain its limited partnership status under California; and (6) had never held a board of directors, officers, or other official meeting in Texas. In his deposition, Wehrly stated that Farallon did not own any physical property and all its business operations were in California. Wehrly also testified that Farallon had bank accounts only in California and New York. These undisputed jurisdictional facts support the trial court's implied finding that Farallon lacked the minimum contacts sufficient to support either specific or general jurisdiction. Accordingly, the trial court properly concluded that it lacked personal jurisdiction over Farallon. *See Michiana,* 168 S.W.3d at 785.

## V. CONCLUSION

For the reasons set forth above, we conclude appellees negated the existence of contacts between each of them and the State of Texas sufficient to support the exercise of general or specific personal jurisdiction over them. Thus, we resolve appellants' second issue against them. Because of our disposition of appellants' issue as to minimum contacts, we need not address whether the exercise of such jurisdiction would have comported with traditional notions of fair play and substantial justice. *See BMC Software Belgium,* 83 S.W.3d at 795. We affirm the trial court's order granting special appearances.