**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-13-00437-CV**
_____

**HOGS DOGS & LACE, LLC and CRYSTAL WARD,**
**Appellants**

**V.**

**SHARP ENTERTAINMENT, LLC,**
**Appellee**

On Appeal from the 75th District Court
Liberty County, Texas
Trial Cause No. CV1206096

**MEMORANDUM OPINION**

Appellants Crystal Ward (Ward) and Hogs Dogs & Lace, LLC (HDL), filed an interlocutory appeal from the trial court's granting of the special appearance filed by appellee, Sharp Entertainment, LLC (Sharp). *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2013). We affirm.

1

## BACKGROUND

Ward and HDL (collectively "Plaintiffs") sued defendants Sharp, A&E Television Networks, LLC (A&E), Christie Chreene (Chreene), and Julie Snead (Snead).[1] The Plaintiffs' amended petition ("petition") asserts several different claims against all of the defendants relating to what Plaintiffs describe as Ward's "concept" for a "television show and educational video series" that involved the presentation of three women engaged in the sport of hog hunting. Defendant Sharp is a nonresident production company with its principal place of business in New York. Plaintiffs allege that Sharp and the other defendants engaged in wrongful conduct relating to Ward's concept for the lady hog hunting show.

The petition states that Ward developed her concept for a lady hog hunting show, and she interviewed various women for the purpose of training them to participate in hog hunting activities for the television show. Ward alleges that she ultimately chose Chreene and Snead as the "talent" for the show. According to the petition, Ward, Chreene, and Snead formed the production and management company known as Hogs Dogs & Lace, LLC (HDL), with Ward as the "managing member," to develop a video and television series around Ward's concept. Plaintiffs contend that Chreene and Snead signed noncompetition agreements with

_____

[1]A&E, Chreene, and Snead are not parties to this interlocutory appeal.

2

HDL, and Ward filmed several hunts and uploaded a video of the female hog hunters onto the internet. Plaintiffs further allege that one of Ward's hog hunting videos was aired on television, and that several entertainment companies showed an interest in the concept and contacted Plaintiffs about developing the HDL show.

According to the petition, HDL entered into a "Production and Shop [A]greement" (production agreement) with 12 Forward Entertainment, LLC (12 Forward), a production company. The production agreement had an expiration date of December 23, 2010, and it granted 12 Forward the right to shop the HDL lady hog hunting series to television networks. The petition further alleges that on or about October 2010, A&E entered into one or more agreements with 12 Forward to produce a pilot and series for a full television show, with the HDL show to be renamed as "Hog Wild." Plaintiffs contend that in the early fall of 2010, Sharp purportedly contacted Ward about the HDL hog hunting show because Sharp watched the HDL video that Ward had uploaded to the internet. Plaintiffs contend that Ward told Sharp the rights were not available for licensing to Sharp at that time because the Plaintiffs were already working with 12 Forward and A&E under a production agreement.

Plaintiffs allege that various disputes regarding compensation arose between the Plaintiffs, A&E, and 12 Forward, and A&E and 12 Forward offered to buy out

3

Plaintiffs, but Plaintiffs declined the offer. In the petition, Plaintiffs state that on or about November 16, 2010, 12 Forward released HDL and Ward from the production agreement. According to Plaintiffs, A&E and Sharp were involved in secret negotiations with each other and with Chreene and Snead to use Ward's concept, material, and intellectual property to produce an "identical series to that of 'Hogs, Dogs & Lace/Hog Wild.'" Sharp named its own hog hunting series "Lady Hoggers." The *Lady Hoggers* series also featured Chreene and Snead. Plaintiffs allege that Sharp "was notified of the non-competition agreements" HDL had with Chreene and Snead, and that, despite having such knowledge of the non-competition agreements, Sharp employed both Chreene and Snead, Sharp used Ward's concept, and Sharp produced (pursuant to an agreement with A&E) the *Lady Hoggers* series which was "substantially similar" to HDL's *Hog Wild*. Plaintiffs contend they were damaged by the actions of Sharp and the other defendants.

In their petition, Plaintiffs assert causes of action against Sharp for breach of contract, breach of fiduciary duty, fraud, negligence, and civil conspiracy. And, HDL alleges causes of action against Sharp for tortious interference with contract (the noncompetition agreements) and tortious interference with business relationships.

4

Sharp filed a special appearance and argued that the trial court lacked personal jurisdiction, either general or specific, over Sharp. In this interlocutory appeal, Plaintiffs argue that the trial court erred in granting Sharp's special appearance motion, because Sharp did not negate all bases for personal jurisdiction pleaded by Plaintiffs, the facts demonstrate both general and specific jurisdiction over Sharp, and the exercise of personal jurisdiction over Sharp does not offend traditional notions of fair play and substantial justice.

## STANDARD OF REVIEW

Whether the trial court has personal jurisdiction over a defendant is ultimately a question of law that we review de novo. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-95 (Tex. 2002). The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the jurisdiction of a Texas court.[2] *Moncrief*, 414 S.W.3d. at 149; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658-59 (Tex. 2010); *Retamco Operating, Inc. v.*

_____

[2]Appellants added additional jurisdictional allegations in their response to Sharp's special appearance. The trial court had the authority to consider appellants' response, as well as their pleadings. *See Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 369, 374 (Tex. App.—Dallas 2007, pet. denied); *EMI Music Mexico, S.A. de C.V. v. Rodriguez*, 97 S.W.3d 847, 853 (Tex. App.—Corpus Christi 2003, no pet.).

*Republic Drilling, Co.*, 278 S.W.3d 333, 337 (Tex. 2009). If the plaintiff meets this initial burden, "the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pled." *Moncrief*, 414 S.W.3d at 149; *BMC*, 83 S.W.3d at 793. The defendant may negate the jurisdictional allegations on either a factual basis or a legal basis.[3] *Kelly*, 301 S.W.3d at 658-59. There being no timely filed findings of fact and conclusions of law, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC*, 83 S.W.3d at 795. If the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court. *Id*.

A trial court has personal jurisdiction over a nonresident defendant if the exercise of jurisdiction is authorized by statute and is consistent with federal and state constitutional due process guarantees. *Moncrief*, 414 S.W.3d at 149; *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 2008). The Texas long-arm statute provides that certain acts constitute doing business in Texas, including, but not limited to, the following:

---

[3]We note that (a) the record includes a statement by the trial judge that the request for findings of fact was not timely called to his attention, (b) the notice of past due findings of fact was not timely filed, and (c) the trial court's findings of fact and conclusions of law were not timely filed. Ward and HDL do not complain on appeal about the lack of timely findings.

6

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; or
(2) commits a tort in whole or in part in this state; or
(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code Ann. § 17.042. Although an allegation of jurisdiction may satisfy the Texas long-arm statute, the allegation still may not necessarily satisfy the United States Constitution. *Moncrief*, 414 S.W.3d at 149. Accordingly, even if a court determines the facts satisfy the Texas long-arm statute, a court must also examine the facts to determine if the exercise of personal jurisdiction over the defendant comports with due process. *See CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996).

Asserting personal jurisdiction over a nonresident defendant comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction comports with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 337. The minimum contacts analysis requires "'some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The focus is on the defendant's activities and expectations. *Am.*

7

*Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). A defendant's contacts may give rise to either general jurisdiction or specific jurisdiction. *See Moncrief,* 414 S.W.3d at 150; *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010). Continuous and systematic contacts with Texas may give rise to general jurisdiction, while specific jurisdiction exists when the cause of action arises out of or is related to specific purposeful activities of the defendant in Texas. *Id*. "The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

## PLAINTIFFS' JURISDICTIONAL ALLEGATIONS

Plaintiffs allege in the petition that Sharp and the other defendants engaged in activities that constitute business in the State of Texas under the Texas long-arm statute in that the defendants (1) contracted with a Texas resident with performance of the agreement in whole or in part thereof to occur in Texas, (2) committed a tort in whole or in part in Texas, and (3) recruits or recruited Texas residents for employment inside or outside of Texas.

As to Sharp, Plaintiffs allege general jurisdictional contacts which include the following:

- Sharp "produces over 60 television programs which are nationally broadcast" on various channels. "[T]hese programs are advertised in Texas, broadcast in Texas and viewed by Texans." "[T]hese television programs were solicited to Texans and broadcast throughout Texas."

- Sharp "filmed production of television programs in Texas, including 'Man vs. Food' in Amarillo Texas, Season 1, Episode 1, . . . "filmed production of . . . 'Adam Richman's Best Sandwich in America' in Texas, which was broadcast on the Travel Channel, where Adam Richman and the film crew visited multiple locations in both Driftwood and Austin, Texas as the destinations focused on in productions."

In addition to the foregoing, Plaintiffs' petition includes the following contacts which also contain jurisdictional allegations:

- In the early fall of 2010, Sharp viewed the HDL website and videos filmed and edited by Crystal Ward and then decided that the concepts of the unique HDL Series would be a great reality series for Sharp to produce.

- Principals at Sharp contacted HDL to inquire about teaming up with HDL to produce a lady hogging series starring the same three ladies of HDL.

- Sharp "used the Television concept of a Texas Plaintiff, absent anticipated compensation."

- Sharp "created a derivative program from that concept and placed that television program into the stream of commerce with the knowledge the distribution would be national."

9

- Sharp's program was then "solicited to Texans and broadcast throughout Texas[.]"

- Sharp placed "products in the stream of commerce with the expectation that the product would enter Texas. . . ."

- Sharp "employed two-thirds of the talent" of HDL in the production of Sharp's show.

- These employees (Chreene and Snead) were Texas residents.

- "A&E and Sharp, despite having been notified of the HDL binding non-compete agreement, collectively decided to employ Julie Snead and Christie Chreene . . . , and to utilize the ideas, Concepts, material and intellectual property of Crystal Ward, and produce an identical series to that of [HDL]."

- Through this employment, the non-competition agreements were breached and appellants' contract with Chreene and Snead were tortuously interfered with.

## EVIDENCE SUBMITTED BY SHARP TO NEGATE PERSONAL JURISDICTION

In their first issue on appeal, Plaintiffs maintain that Sharp failed to meet its burden of negating all of the allegations of personal jurisdiction because Sharp presented no evidence to controvert the jurisdictional allegations in the petition. The Plaintiffs emphasize that Sharp did not present evidence at the hearing on the special appearance. The trial court, however, is not limited to evidence presented at the hearing. "The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and

10

attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a. Plaintiffs contend that the trial court struck the affidavit of Bob Larson, vice president of Sharp, and they argue that Sharp therefore failed to present any evidence to negate the allegations of personal jurisdiction contained in the Plaintiffs' petition. We have reviewed the record, and although there is an order in the record that indicates the trial court struck Larson's second affidavit, we find nothing in the record that indicates the trial court struck Larson's first affidavit. His first affidavit was before the trial court for its consideration at the time of the hearing on the special appearance. Based on the contents of Larson's affidavit, we conclude that there was some evidence challenging the personal jurisdiction allegations, and we must therefore examine the record to determine if Sharp has negated every basis for both general and specific jurisdiction. Accordingly, we overrule appellants' first issue.

### GENERAL JURISDICTION

Plaintiffs argue that the trial court erred in granting Sharp's special appearance motion, because the court has general jurisdiction over Sharp. A trial court has general jurisdiction over a nonresident defendant when the defendant's contacts with the forum are systematic and continuous. *Spir Star AG*, 310 S.W.3d at 872. As the United States Supreme Court recently explained, a court has general

jurisdiction when the nonresident defendant's affiliations with the State in which suit is brought are so constant and pervasive "'as to render [the nonresident defendant] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S.Ct. 746, 749, 751 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2854, 2851, 2857 (2011)).

The jurisdictional allegations in the petition (outlined above in more detail) generally include the following: Sharp produces over sixty (60) different television programs that are nationally broadcast on popular mainstream channels; the programs are advertised and broadcast throughout Texas and are viewed by Texans; Sharp filmed television programs in Texas, including an episode of "Man v. Food" and an episode of "Adam Richman's Best Sandwich in America."[4]

In *PHC-Minden, L.P. v. Kimberly-Clark Corporation*, 235 S.W.3d 163, 168 (Tex. 2007), the Texas Supreme Court characterized the inquiry for general jurisdiction as a "'more demanding minimum contacts analysis' with a 'substantially higher' threshold" than that required for specific jurisdiction. *Id*. (quoting *CSR, Ltd.*, 925 S.W.2d at 595 and 4 Wright & Miller, Federal Practice &

---

[4]Appellants also contend that Sharp produced and directly distributed seasons one and two of the series *Rattlesnake Republic* in Texas locations, but that contention was not made until after the trial court granted Sharp's special appearance motion. The allegation was not before the trial court at the time the special appearance was sustained, and we do not consider it in this interlocutory appeal.

Procedure § 1067.5). There must be evidence that the defendant conducted "substantial activities" within Texas. *CSR Ltd.*, 925 S.W.2d at 595. Nevertheless, there is no "precise formulation" for determining which general jurisdictional contacts will be sufficient to "reach a tipping point[.]" *PHC-Minden*, 235 S.W.3d at 167.

"Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *Id*. (quoting 4 Wright & Miller, Federal Practice & Procedure § 1067.5). For general jurisdiction purposes, we do not view each contact in isolation. *Am. Type Culture Collection*, 83 S.W.3d at 809. The reviewing court carefully considers the contacts and analyzes them for "proof of a pattern of continuing and systematic activity[,]" and we look at the quality of those contacts, not just the quantity. *See id*. at 809-10.

In order for Texas courts to exercise general jurisdiction over Sharp, Sharp's contacts must be not only *continuous and systematic*, but also *substantial*. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d at 575; *CSR Ltd. v. Link,* 925 S.W.2d at 595. Furthermore, even multiple contacts with a state may not be sufficient. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415-19

13

(1984) (finding no "continuous and systematic" contacts with Texas, despite the fact that defendant had gone to Texas to negotiate a contract, purchased helicopters and related equipment from Texas vendors at regular intervals, and sent prospective pilots and other personnel to Texas for training); *see also Am. Type Culture Collection, Inc.*, 83 S.W.3d 807-10 (finding no general jurisdiction despite fact that defendant had sold its products to Texas residents for 18 years, had purchased supplies from Texas vendors, had attended conferences in Texas, and had served as a repository for Texas researchers).

The question is whether or not HDL and Ward established sufficient evidence that Sharp had substantial systematic and continuous contacts with the State of Texas to meet due process requirements and to allow the trial court to have general jurisdiction over Sharp. After reviewing the entire record, we cannot characterize Sharp's contacts as substantial, systematic, or continuous. Compare the contacts of Sharp, as alleged by HDL and Ward in their petition, to the contacts of the nonresident defendant in *Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437 (1952), an early post-*International Shoe*[5] seminal case regarding general jurisdiction. In *Perkins*, the president of the company maintained an office in Ohio in which he "did many things on behalf of the company." *Id*. at 447-48.

---

[5]*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

The president maintained company files in Ohio, drew and distributed salary checks from the Ohio office, carried on correspondence from Ohio, used two Ohio bank accounts for company funds, had an Ohio bank act as transfer agent for the company stock, held directors' meetings in Ohio, supervised policies there dealing with the rehabilitation of the corporation's properties in the Philippines, and dispatched funds from Ohio bank accounts to cover purchases of machinery for the rehabilitation. *See PHC-Minden*, 235 S.W.3d at 167-68 (citing *Perkins*, 342 U.S. at 447-48).

Similarly, in *Helicopteros*, the Supreme Court found that there was no continuous and systematic contact with Texas when "Helicol's contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training." *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). Sharp's contacts were less systematic and purposeful than those rejected by the Supreme Court in *Helicopteros*. Sharp's contacts are more properly characterized as sporadic and limited, rather than continuous and systematic. And, such alleged contacts would be insufficient to support general jurisdiction.

15

In arguing that the trial court had general jurisdiction over Sharp, Plaintiffs rely on *Asahi Metal Industry Co. v. Superior Court of California, Solano County*, 480 U.S. 102 (1987) to support their argument that Sharp's contacts are systematic and continuous and justify general jurisdiction. But, *Asahi,* is distinguishable from the case at bar. *Asahi* is a "stream of commerce" case, and it concerns *specific* jurisdiction, not general jurisdiction. The United States Supreme Court has reaffirmed that the stream of commerce theory of jurisdiction is only applicable to a "specific jurisdiction analysis." *See Brown*, 131 S.Ct. at 2855-56 ("A corporation's 'continuous activity of some sort within a state,' *International Shoe* instructed, 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)). As stated by the Supreme Court earlier this year, a court may assert general jurisdiction over a foreign corporation "only when the corporation's affiliations with the State in which the suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S.Ct. at 751 (quoting *Brown*, 131 S.Ct. at 2851). We conclude that the evidence in the record does not establish that Sharp has affiliations with the State of Texas which are so constant and pervasive so as to render Sharp "at home" in this State. *See Daimler*, 134 S.Ct. at 751. The alleged contacts are too

16

sporadic and limited to warrant a finding of general jurisdiction. *See Helicopteros,* 466 U.S. at 416. We agree with the trial court that Sharp's contacts with Texas do not support general jurisdiction.

## SPECIFIC JURISDICTION

Next, we examine whether the trial court had specific jurisdiction over Sharp. Specific jurisdiction exists when there is evidence that the defendant purposefully availed itself of the forum's jurisdiction by contacts or activities in the forum state, and the cause of action arises from or is related to those contacts or activities. *Retamco Operating*, 278 S.W.3d at 338 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)); *Michiana Easy Livin' Country*, 168 S.W.3d at 784. Under specific jurisdiction, the focus is on the relationship between the forum, the defendant, and the litigation. *Moncrief*, 414 S.W.3d at 150; *Retamco Operating*, 278 S.W.3d at 338. There must be a substantial connection between the defendant's contacts and the operative facts of the litigation. *Moncrief*, 414 S.W.3d at 156. The contacts must be such that the defendant "should reasonably anticipate being haled into court" in Texas. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). With respect to the tort claims, Texas's interests in protecting its citizens against torts is insufficient to automatically exercise personal jurisdiction when the nonresident directs a tort from outside the forum. *Michiana*

17

*Easy Livin' Country*, 168 S.W.3d at 784. We must analyze the jurisdictional contacts on a "claim-by-claim basis" unless all claims arise from the same forum contacts. *Moncrief,* 414 S.W.3d at 150-151.

When considering whether the nonresident purposefully availed itself of the privilege of conducting activities within Texas, we look at three factors: (1) whether the defendant had contacts and activity in and with Texas; (2) whether the contacts relied upon were purposeful rather than random, fortuitous, or attenuated; and, (3) whether the defendant sought some benefit, advantage, or profit by availing itself of the jurisdiction. *Id*. at 151.

Plaintiffs pleaded various jurisdictional allegations which they relate to their argument that the trial court should exercise specific jurisdiction over Sharp. We previously itemized the jurisdictional allegations. *See infra* at 9-10. Summarily, the pertinent allegations include that Sharp viewed materials from HDL, telephoned Ward to discuss the concept behind HDL, created and produced a derivative program from the concept of Ward (a Texas plaintiff), placed the television program into the stream of commerce, employed two-thirds of the talent of HDL in the production of *Hog Wild*, and tortiously interfered with noncompete agreements between Chreene, Snead, and HDL. Plaintiffs also alleged Sharp knew that its show *Hog Wild* would be shown in Texas and that *Hog Wild* was "solicited" to

18

Texans, advertised in Texas, broadcast in Texas through Sharp's deal with A&E, and viewed by Crystal Ward and millions of Texans through A&E.

As we have noted, Larson states in his first affidavit that Sharp is a New York company, it has no offices or employees in Texas, it does not own real property in Texas, it does not have a registered agent in Texas, it is not qualified to do business in Texas, and it does not conduct business in Texas. Nonetheless, he also acknowledges in his affidavit certain limited contact with Texas, when he states: "To the best of my knowledge, the only contact Sharp has had with any of the Plaintiffs within the state of Texas, or elsewhere, is a brief exchange whereby a Sharp employee reached out [to] numerous persons involved in the hog hunting industry including, plaintiff Crystal Ward, to inquire by email if they were interested in being talent for a show Sharp had created and a return call indicating there was no interest[.]"[6] Larson also states, "Sharp did not contact HDL to inquire about teaming up to produce a lady hogging series with HDL[,]" and "[o]ther than the above-described interactions, there were no other contacts with Plaintiffs in Texas or elsewhere." Accordingly, Larson expressly denies the allegation in

---

[6]Larson's statement concerning the contact Sharp had with the Plaintiffs is prefaced with the language, "To the best of my knowledge[.]" Appellants did not object in the trial court to such language in the November 9, 2012 affidavit, nor do they contend on appeal that this language renders the affidavit deficient.

19

Sharp's petition that Sharp contacted HDL about joining together to produce a lady hog hunting series starring Ward, Chreene, and Snead. Notably, Plaintiffs fail to plead or present evidence that Sharp had any contacts with Chreene or Snead in Texas.

According to the petition, Ward put the videotape she made of her lady hog hunters series on the internet (which was available to Sharp and others for viewing), and Plaintiffs allege that Sharp viewed "[m]aterials from the Hogs Dogs & Lace." There is no evidence in the record or allegation in the petition which would establish the location where Sharp viewed such material. We fail to see how Sharp's viewing of the HDL video--which Ward acknowledges that she, not Sharp, put on the internet—demonstrates that Sharp purposefully availed itself of the jurisdiction of Texas courts, let alone made a substantial connection with the forum. The record does not show a viewing by Sharp of the video material in Texas, or that the viewing was anything more than a random or fortuitous contact. The fact that Sharp admits it "reached out" to "numerous persons . . . including, plaintiff Crystal Ward," about whether Ward had an interest in a show "that Sharp had created" and a return call that there "was no interest" does not establish specific jurisdiction as to any of the causes of action asserted against Sharp in the petition. Moreover, Sharp's *Lady Hoggers* show was apparently filmed by Sharp in

20

Florida, not Texas. Although Sharp's show may have been broadcast in Texas by A&E pursuant to an agreement between A&E and Sharp, such facts would not be sufficient to establish specific jurisdiction with respect to Plaintiffs' claims against Sharp.

With the exception of its admitted contact with Ward, as stated in Larson's first affidavit, Sharp denied any other activity or contact within Texas. Appellants contend that placing products (the *Lady Hoggers* television series) into the stream of commerce with the expectation that the product will enter Texas is sufficient to establish specific jurisdiction. Sharp presented evidence that, except for the aforementioned inquiry, Sharp did not have any other contacts in Texas. The fact that some of Sharp's other television shows or an episode of *Lady Hoggers* may have been viewed by the general public in Texas does not provide evidence that Sharp purposefully directed its actions at Texas. As explained in *Spir Star AG*, 310 S.W.3d at 873, a seller's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placement of the product into the stream of commerce into an act purposefully directed toward the forum state. There must be some additional conduct that indicates an intent or purpose to serve the market in the forum state. *Id.*; *see also Zinc Nacional*, 308 S.W.3d at 397-98. The fact that Sharp's *Lady Hoggers* television series may have

21

made it into the Texas stream of commerce is not enough to confer specific jurisdiction on the Texas court. *See Spir Star AG*, 310 S.W.3d at 873.

Plaintiffs argue that Sharp was notified of the noncompetition agreements which HDL had with Chreene and Snead, and that despite knowing about these agreements "Sharp recruited, contracted, and employed" Chreene and Snead in the production of Sharp's television program (*Lady Hoggers*), and then filmed the series in Florida. Sharp acknowledges that *Lady Hoggers* was filmed in Florida and that the company hired Chreene and Snead as the talent for the show. Plaintiffs allege that the *Lady Hoggers* show was broadcast in Texas. HDL argues such actions by Sharp constitute the underlying facts of HDL's tortious interference claims against Sharp. HDL also argues that that this conduct was "recruitment" as contained in the Texas long-arm statute. We disagree. As we have noted, the Texas long-arm statute provides that recruiting Texas residents, directly or through an intermediary located in Texas, for employment inside or outside this state, constitutes doing business in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. The record demonstrates that Sharp made contact with Ward, but there is a lack of evidence in the record to establish whether Sharp "recruited" Chreene and Snead in Texas.

Although Sharp acknowledged it employed two Texas residents, Chreene and Snead, in the production of Sharp's *Lady Hoggers* show, there is a lack of evidence in the record to determine whether the employment was the result of Sharp's contacting Chreene and Snead, or Chreene's and Snead's contacting Sharp, or some other contact via an intermediary or third party. We find nothing in the record to rebut the first Larson Affidavit. There was no evidence presented to the trial court below that Sharp recruited Chreene and Snead in Texas directly or through an intermediary located in Texas, or that it entered into an agreement with them in Texas, or that they worked for Sharp in Texas. *See id.* § 17.042(3). Under the facts presented, the employment of Chreene and Snead by Sharp does not demonstrate a purposeful availment or a substantial connection with Texas, particularly when there is no evidence that the contacting, recruitment, hiring, and work occurred in Texas. *See id.*; *see generally Morris v. B.C. Olympiakos, SFP*, 721 F.Supp.2d 546, 564-67 (S.D. Tex. 2010) (no evidence Olympiakos recruited Morris directly or through any Texas-based intermediary to work in Greece and thus no purposeful availment). Moreover, the evidence currently before us indicates that Chreene and Snead worked on Sharp's show in Florida, not Texas.

In *Moncrief*, the Supreme Court held that the defendants' contacts with Texas supported exercise of personal jurisdiction with regard to Moncrief's trade

23

secret claims, but not as to the tortious interference claim. *See* 414 S.W.3d at 147-48. A distinguishing factor emphasized by the Supreme Court was that Gazprom, one of the defendants sued by Moncrief, attended two Texas meetings with a Texas corporation and accepted alleged trade secrets in Texas regarding a potential joint venture in Texas with the Texas corporation. *Id.* at 143. In contrast to the trade secret claim, the Supreme Court found that the tortious interference claim did not arise from the Texas meetings or the defendant's receipt of the trade secret information from Moncrief. Instead, the tortious interference claim arose principally from a California meeting and a competing enterprise in Texas. *Id.* at 157. "[A] nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction." *Id.* As the Supreme Court stated, "[T]he Gazprom Defendants' alleged tortious conduct in California against a Texas resident is insufficient to confer specific jurisdiction over the Gazprom Defendants as to Moncrief's tortious interference claims." *Id.* at 157.

In the instant case, Plaintiffs contend that Sharp tortiously interfered with the noncompetition agreements between Chreene, Snead, and HDL by hiring the two women and then using them as talent in a television series very similar to that of HDL. The evidence does not show that Sharp "recruited" them or directly contacted the two women in Texas, or that it contacted them through an

24

intermediary in Texas. The evidence does not show which party or parties initiated the contact, or whether any such contact occurred in Texas. The alleged tortious interference through the production of a similar television series occurred in Florida, not Texas. As in *Moncrief*, the alleged tortious conduct is insufficient to confer specific jurisdiction over Sharp as to Plaintiffs' tortious interference claims.

Based on the pleadings and the evidence before the trial court, we conclude that the record does not demonstrate that Sharp purposefully availed itself of the privilege of doing business in Texas. The record does not contain evidence showing Sharp had substantial contacts with Texas that relate to and arise out of Ward's and HDL's causes of action for breach of implied contract, breach of fiduciary duty, negligence, fraud, and civil conspiracy against Sharp. Furthermore, at this time, there is no pleading and no evidence that Sharp directly contacted Chreene or Snead or indirectly contacted them through an intermediary located in Texas, or that Sharp recruited them in Texas, or that it contracted with them in Texas, or that it hired them in Texas, or that the work on the Sharp series was performed in Texas. Under this record, there is insufficient evidence that Sharp purposefully availed itself of the benefits of conducting activities in Texas. There is a lack of a substantial connection between the defendant's contacts in Texas and the operative facts of the litigation. The alleged connections to Texas as asserted in

the petition and the evidence regarding Sharp's activities are too attenuated to establish either general or specific jurisdiction for the claims asserted by the plaintiffs. Accordingly, we overrule issue two.

## FAIR PLAY AND SUBSTANTIAL JUSTICE

In their third issue, Plaintiffs also contend that the assertion of personal jurisdiction over Sharp would not offend traditional notions of fair play and substantial justice, as required for due process. *See Moncrief*, 414 S.W.3d at 150. Having overruled issues one and two we need not address this third issue. *See Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 840-41 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). We conclude that the trial court did not err in granting the special appearance. The trial court lacked personal jurisdiction over Sharp. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 16, 2014
Opinion Delivered July 10, 2014

Before Kreger, Horton, and Johnson, JJ.

26